## STATE *v.* STOLL.

If the provisions of a special charter or a special authority derived from the legislature, can reasonably well consist with general legislation whose words are not absolutely harmonious with it, the two are to be deemed to stand together; one as the general law of the land, the other as the law of the particular case.

Where a State had publicly promised that the notes of a bank in which it was the sole stockholder, and for whose bills it was liable, should be taken in payment of taxes and all other debts due to the State, and so impressed the credit of the State upon the notes : *Held*, that when the State afterwards intended to terminate this obligation (as it could do upon reasonable notice as to after-issued bills), it was bound to do it openly, and in language not to be misunderstood. As a doubtful or obscure declaration would not be a proper one for the purpose, so it was not to be imputed.

The court construes different sections of the statutes of the State of South Carolina relating to the banks of that State, and holds—under the sixteenth section of the charter of the bank known as " the President and Directors of the Bank of the State of South Carolina," or more briefly " the Bank of the State," (which enacted " that the bills or notes of the said corporation originally made payable, or which shall have become payable on demand, in gold or silver coin, shall be receivable in all payments for taxes or other moneys due the State ")—that the bills of the bank, although issued after December 20th, 1860, were a legal tender for the payment of taxes due the State in 1870, notwithstanding the fact that the bank at the time of their presentation did not redeem its notes in specie, and notwithstanding that in 1843 the legislature had enacted that " all taxes for the service of the State shall be paid in specie . . . or the notes of specie-paying banks."

ERROR to the Supreme Court of the State of South Carolina; the case being thus :

Between the years 1801 and 1812 the legislature of South Carolina incorporated five banks, viz., the Bank of South Carolina, in 1801; the State Bank of South Carolina, in 1802; the Union Bank, and the Planters' and Mechanics' Bank, in 1810, and " the President and Directors of the Bank of South Carolina," called for brevity THE BANK OF THE STATE OF SOUTH CAROLINA, and sometimes THE BANK OF THE STATE, in 1812.

The preamble to the act of incorporation of this last-

named bank set forth that "it is deemed expedient and beneficial to the State and the citizens thereof to establish a bank on the funds of the State, for the purpose of discounting paper and making loans for longer periods than has heretofore been customary, and on security different from what has hitherto been required."

The charter then declared that certain stocks, which were designated, should constitute and form. the capital of the said bank, and be vested in the president and directors, who should be appointed in a manner there provided, and then adds:

"And the faith of the State is hereby pledged for the support of the said bank, and to supply any deficiency in the funds specially pledged, and to make good all losses arising from such deficiency."

The sixteenth section of the charter to this bank provided, as did also the same section in the charters of the four other banks above referred to, as incorporated in previous years,

"That the bills or notes of the said corporation, originally made payable, or which shall have become payable, on demand, in gold or silver coin, shall be receivable at the treasury of this State, and by all tax collectors and other public officers, in all payments for taxes or other moneys due to the State."

In 1832 the bank last named (the Bank of the State), and of which we are principally to speak, was rechartered by an enactment,

"That an act entitled an act to establish a bank in behalf of, and for the benefit of the State, passed on the 19th December, in the year of our Lord 1812, and all other acts now of force relating to the conduct and operations of the said bank, be, and they are hereby, re-enacted and continued of force until the 1st May, 1856."

In 1852 the charter was again renewed in these terms:

"That from and after the expiration of the present charter of the Bank of the State of South Carolina, the same shall be, and

is hereby extended until the 1st of January, which will be in the year of our Lord, 1871."

So the charters of the four other banks were at different times extended, and among the times of the first two in 1822 and 1833; and of the last two in 1830; and in all *these* extensions or recharters the privileges of the sixteenth section of making the notes receivable in payment of taxes, irrespectively of the fact whether the notes were redeemable in specie, were retained.   We speak hereafter of a recharter of these four banks in 1852 and 1853, when these privileges were not retained.

In 1857, in the act to raise supplies for the year commencing in October, 1857, it is provided:

"That the comptroller-general shall direct the tax collectors and treasurers to receive the taxes and other dues to the State only in notes of the Bank of the State, OR of specie-paying banks of this State, or in coin of the United States."

In 1865 the legislature declared, that the branches and agencies of the Bank of the State of South Carolina should be closed, and the principal bank in Charleston cease to be a bank of issue, and continue to act as a bank of deposit until further orders of the legislature.

In 1868 the legislature passed an act to close the operations of the bank; and by the fourth section of the act enacted "that the sixteenth section of the act, ratified the 19th December, 1812, entitled 'An act to establish a bank on behalf of and for the benefit of the State,' and all acts and parts of acts which render the bills of said corporation receivable in payment of taxes and all other dues to the State, be, and the same are hereby repealed."

In the year 1843, that is to say, before the date of the second recharter above mentioned of the Bank of the State, the legislature passed an act "prescribing the duties of certain officers in the collection of supplies, payment of salaries, and for other purposes," and the first section of this act enacted,

"That all taxes for the use and service of the State shall be

paid in specie, 'paper medium,'* or the notes of specie-paying banks."

This was a permanent act. But in all previous years, with the exception of the year 1837, of which we speak directly, as far back at least as 1826, the same enactment had been introduced into each annual appropriation bill as a special enactment. In 1837, in which year there was a general suspension of specie payments throughout the United States, the enactment was :†

" That the taxes be paid in specie . . . or the bills of the banks of the State. And if any bank shall in the opinion of the comptroller-general become unsafe, it shall be his duty to order their reception to be discontinued by the tax collectors."

So far as regards the Bank of the State of South Carolina and the four other banks named in connection with it.

We now pass to certain banks incorporated in years of later date.

Between the year 1831 and the year 1836, seven of these banks were incorporated by the State, to wit: the Commercial Bank of Columbia, in 1831; the Merchants' Bank of South Carolina at Cheraw, in 1833; the Bank of Charleston, in 1834; the Bank of Camden, in 1835; the Bank of Hamburg, in the same year; the Bank of Georgetown, and the Southwestern Railroad Bank, in 1836. Except in the case of the one last named, the charters of each of these banks contained a section in the words following, viz.:

" The bills or notes of the said corporation, originally made payable on demand, or which shall have become payable, in gold or silver, current coin, shall be receivable by the treasurers, tax collectors, solicitors, and other public officers, in all payments for taxes, or other moneys due to the State, so long as the said bank shall pay gold and silver, current coin, for their notes; but whenever there shall be a protest on any of the bills

---

\* This " paper medium " was a currency issued in 1785, of which it was supposed that some remnant might be outstanding.

† 6 South Carolina Statutes at Large, 584.

or notes of the said bank for non-payment of specie, the comptroller-general shall be authorized, and he is hereby required, to countermand the receipt of the bills and notes of the said bank in payment of taxes or debts due to the State, unless good and satisfactory cause shall be shown him, by the said corporation, for protesting in a court of justice the payment thereof."

The charter of the remaining bank was to the same effect, omitting the direction to the comptroller-general and his action thereon.

Reverting now to the five earlier banks and to recharters of them, the reader will remember that in the *recharters* of the Bank of the State of South Carolina, made, first in 1832 and again in 1852, " the same," the old charter of 1812—including, of course, the sixteenth section—was continued. And that the same thing was true of the four other banks, so far as related to their recharters as made in 1822, 1830, and 1833. But while in regard to the Bank of the State of South Carolina, no variation was made on the old charter during the active existence of the bank, nor until the legislature in 1868 passed the act to close its operations, the same was not true of the other four early banks which we have spoken of chiefly in connection with it. A variation was finally made on them. And when, *after* their recharters of 1822, 1830, and 1833, they were again rechartered in 1852 and 1853, the old sixteenth section was not re-enacted in regard to them, but they were made subject to the last above-quoted restriction of the later banks; the banks, namely, incorporated between the years 1831 and 1836.

In this condition of State legislation, one Wagner, who was indebted to the State for taxes for the year 1870, tendered to a certain Stoll, a collector of taxes, whose duty it was to collect and receive such taxes, in payment of his taxes, bills of the already mentioned " the President and Directors of the Bank of the State of South Carolina," or as more briefly called the Bank of the State of South Carolina, or Bank of the State. The bills were issued after December 20th, 1860,

though not in aid of the rebellion.   At the time of their presentation the bank did not redeem its notes in specie. The officer refused to receive them, and Wagner presented his petition to the court below for a mandamus to compel him to receive the same.

The question in the case was the nature and extent of the obligation of the contract which, under the sixteenth section of the charter of the Bank of the State, arose between the State of South Carolina and the holder of bills of the bank to receive the bills in payment of taxes due the State.

It was asserted by Stoll, the tax collector, that the sixteenth section of the charter of the bank had been repealed or so far modified by the act passed in 1843—enacting* that " all taxes for the use and service of the State shall be paid in specie, paper medium, or the notes of specie-paying banks of this State"—that thereafter the bills of the bank in question were not receivable for taxes due to the State, unless the bank was in fact at the time the taxes became payable a bank that redeemed its notes in specie; the argument being that although by this sixteenth section of the charter of the bank the receivability of its notes in payment of taxes or other moneys due to the State, was guaranteed, whether they were or were not in fact redeemed in coin when presented for payment; yet that the act of 1843 prohibited the receipt in payment of taxes of the notes of any bank which did not in fact redeem its notes in specie when presented for payment, and that the latter act being inconsistent with the former effected its repeal or modification.

The Supreme Court of the State thought this argument sound, and adjudged that the tax collector of the State was not bound to receive them, and refused the mandamus.

To reverse that judgment this writ of error was taken. The case was twice argued : first at the last term, and now, again, much more fully at this.

*Messrs. W. W. Boyce, A. G. Magrath, and B. R. Curtis, for the plaintiff in error ; Mr. D. H. Chamberlain, contra.*

---

* See *supra,* pp. 427–8.  -  .

.Mr. Justice HUNT delivered the opinion of the court.

It is evident from a comparison of the different statutes incorporating the banks—1st, that as to all the banks, the statutory description of their notes to be received in payment of taxes, referred to the form of the notes, viz., those expressed upon their face to be payable in gold or silver, and which are originally or by lapse of time had become payable on demand, and not to the fact that specie was actually paid when the notes were presented for payment; and 2dly, that the legislature intended to provide that a different rule should be applied to the two classes of banks. In the case of the banks chartered between 1801 and 1812, it was simply provided that their bills should be received in payment of taxes and other moneys due to the State. In the case of those chartered between the years 1831 and 1836, it was provided that their bills should be thus receivable so long only as they should pay gold and silver, current coin, for their notes. The two classes of banks were thus confessedly placed upon a different basis, and so remained when the act of 1843 was passed.

To justify this court in holding that the act passed in that year repealed or modified the sixteenth section of the charter of the bank in question, it must appear that the later provision is certainly and clearly in hostility to the former. If, by any reasonable construction, the two statutes can stand together, they must so stand. If harmony is impossible, and only in that event, the former law is repealed in part or wholly, as the case may be.* The principle is thus expressed in *Daviess* v. *Fairbairn:†* "If a subsequent statute be not repugnant in all of its provisions to a prior one, yet if the latter statute clearly intend to prescribe the only rule which shall govern, it repeals the prior one."

Is it clear and certain that the act of 1843 was intended to prescribe the only rule to govern the receivability of bank

---

* Dwarris on Statutes, 530; Sedgwick on Statutes, 126; United States *v.* Tynen, 11 Wallace, 88, 92; Henderson's Tobacco, 11 Ib. 657.

† 3 Howard, 636, 643.

notes, and that a different rule was not intended to be ap-
plied to the banks chartered before 1812, and those char-
tered after 1831?   Were not the words " the specie-paying
banks," in the act of 1843, intended as a description of the
banks then in existence, and which then actually paid specie
on their notes, as if the act had said " all taxes . . . shall
be paid in specie, . . . or the notes of the banks of the
State now paying specie in conformity with their charter, to
wit: the notes of the Bank of the State of South Carolina,
the Union Bank, &c. ?"

The statute-book shows that for many years prior to 1843,
at each successive session, the legislature passed an annual
supply bill, in which was regularly re-enacted the provision,
that the taxes due to the State for that year should be paid
in specie, paper medium (a currency now at an end), or in
the notes of specie-paying banks.   This was a temporary
and annual act, and was enacted yearly at least as early as
the year 1826, until and including the year 1842, with the
exception of the year 1837.   In the year 1837, it is said the
banks were in a state of suspension, and the legislature en-
acted that the taxes should " be paid in specie, . . . or the
bills of the banks of the State, and if any bank shall, in the
opinion of the comptroller-general, become unsafe, so that
its bills ought not to be received at the treasury, it shall be
his duty to order their reception to be discontinued by the
tax collectors."

In the year 1843 the provision above recited and so fre-
quently adopted was re-enacted as a part of the general law
of the State, and it was no longer embraced in the annual
supply bill.

Whether contained in the annual supply bills or in the
more durable form of the act of 1843, we are satisfied that
that act was not intended by the legislature as a repeal of
the sixteenth section of the act incorporating the Bank of
the State of South Carolina.

To sustain this view, we refer to the acts extending the
charter of the bank in question.   It was chartered in the
year 1812.   Its charter expired in the year 1832, and was in

that year extended for a further term of twenty years. In the year previous, in the succeeding year, and in this same year, the legislature enacted the provision that "taxes should be paid in specie, paper medium, or the notes of the specie-paying banks of the State." It, however, re-enacted in its extended charter the provision that the notes of the Bank of the State should be receivable in payment of taxes, if payable in form in specie and on demand.

Again, in the year 1852, nine years after the passage of the act of 1843, the legislature for the second time extended the charter of this bank, including the original sixteenth section. If there be a conflict between these statutes, it might well be argued that the act of 1852 re-enacting the sixteenth section operated as a repeal of the law of 1843, so far as it related to this bank. Whether this be the case, or whether the two are to be continual as both continuing in force and as being applicable to different subjects, the result is the same, that the sixteenth section remains in force.

This view is further illustrated by the fact that the four other banks whose charters were granted prior to 1812, were extended without any alteration of their charters. Notwithstanding the yearly enactment that taxes should be collected in gold and silver, or the notes of specie-paying banks, the charters of the State Bank and of the Bank of South Carolina were extended in the year 1822, and those of the Union Bank and of the Planters' and Mechanics' Bank, in the year 1830, and again in 1833 the charters of the State Bank and the Bank of South Carolina were further extended; and in each instance the provision was retained making the notes receivable in payment of taxes without reference to the fact that their notes should be redeemed in specie. It is difficult to believe that the legislature intended the act of 1843 to act as a repeal or modification of these laws, some passed prior and some subsequent to that date.

It is evident, again, that the legislature of South Carolina, when they intended that the bills of non-specie-paying banks should not be received in payment of taxes, used language perfectly adapted to that purpose, and indicated the process

by which it would easily, but certainly, be accomplished. Thus, in the charters of the banks incorporated between the years 1831 and 1836, is found the provision already quoted, viz.: " That the bills or notes of said corporation, originally made payable on demand, or which shall have become payable, in gold or silver, current coin, shall be receivable by the treasurers, tax collectors, solicitors, and other public officers, in all payments for taxes or other moneys due to the State, so long as said bank shall pay gold and silver, current coin, for their notes. But whenever there shall be a protest on any of the bills or notes of said bank, for non-payment in specie, the comptroller-general shall be authorized, and is hereby required, to countermand the receipts of the bills and notes of the bank, in payment of taxes and debts due to the State, unless good and satisfactory cause shall be shown him, by the said corporation, for contesting in a court of justice the payment thereof."

It is thus expressly enacted that its bills shall be receivable for taxes so long only as the said bank shall pay gold or silver current coin for its notes. A precise definition is given of what constitutes a failure so to pay, to wit, a protest for non-payment in specie of its notes or bills, and a mode is provided of precluding their further reception, to wit, the action of the comptroller-general.

Again, when the charters of the four early banks, the associates of the Bank of the State, in date as well as in the terms of their charter, were last extended, in 1852 and 1853, they were subjected to the same restrictions as the other banks mentioned. Their recharter was expressly made subject to the condition that their notes should be received in payment of taxes so long only as the banks should pay gold and silver current coin for their notes.

The Bank of the State was the property of the State. The State was its only stockholder, and its faith and credit stood publicly pledged for the payment of its notes. In the case of that bank all the specifications are absent. The legislature intentionally omitted to say that its bills should not be receivable for taxes when it failed to redeem them in specie.

It omitted to furnish the test of non-specie-payment, a pro-test, and omitted to authorize the comptroller-general to forbid their reception.

It is scarcely credible, under these circumstances, that the legislature intended the Bank of the State to stand upon the same plane with the other banks. We do not think it was so intended or that such is the legal effect of the statutes we have been considering.

The absence, in the case of the Bank of the State, of the necessary machinery to prevent the reception of its notes if it ceased to be a specie-paying bank, affords a strong argument in support of this view. The notes were intended to be received by the hundreds of tax collectors throughout the State, a class of men not usually qualified to decide nice legal questions, and not elected with a view to their capacity to make such decisions. Yet the question of whether a bank was a specie-paying bank or a non-specie-paying bank rested in the judgment and decision of the collector. If one collector held as a matter of law that a bank which paid specie on its bills but refused to pay specie on its deposits was a specie-paying bank, he could receive its notes in payment of taxes. If the collector in an adjoining district held that the payment of its deposits was a more important element than the redemption of its notes in specie, and that this afforded the test of a specie-paying bank, the notes could be refused by him. Great and inevitable confusion would result. That such confusion was anticipated, and that it was intended to be avoided, is evident from the clear, detailed, and precise provisions applied to those banks where the actual payment of specie by them was intended to be required. These details not being provided for the Bank of the State, a strong argument arises that the actual payment of specie was not intended to be required of that bank.

That the principle of implied repeal or modification does not apply to the charter of the Bank of the State we are considering is evident also from two other considerations: 1. The State of South Carolina had publicly undertaken and promised that the notes of this bank should be taken in pay-

ment of taxes and all other debts due to the State. It impressed the credit of the State upon the notes. Every man, who held and received them had a right to rely upon this promise. When the State intended to terminate this obligation, as it has been held it could do upon reasonable notice and as to after-issued bills, it was bound to do it openly, intelligibly, and in language not to be misunderstood. As a doubtful or obscure declaration would not be justifiable, so it is not to be imputed. 2. The provisions of a special charter or a special authority derived from the legislature are not affected by general legislation on the subject. The two are to be deemed to stand together; one as the general law of the land, the other as the law of the particular case.*

In September, 1868, an act was passed by the legislature of South Carolina to close the operations of this bank. In the fourth section it was enacted that the original act, " and all acts and parts of acts, which render the bills of said corporation receivable in payment of taxes and all other debts due to the State, be, and the same are hereby, repealed." The sixteenth section was the act, the extension of 1832 and the extension of 1852 were " the parts of acts" which rendered its bills receivable in payment of taxes. This was the explicit and intelligible declaration to which the public was entitled to, and the legislature intended to terminate the receivability of its notes in payment of taxes or debts due to the State. At this time, and not before, was the sixteenth section of its charter actually and legally repealed.

Much that is difficult in the consideration of the case of this bank is explained by the fact that the State itself was its sole stockholder, receiving all the benefits of its bills issued, and responsible for all its losses and the payment of its bills.

Upon the whole case we are clear that the judgment be-

---

* See Dillon on Municipal Corporations, § 54, where many cases to this effect are collected.

-low must be REVERSED, AND A MANDAMUS ISSUED to the collector, directing him to receive in payment of the relator's taxes the bills offered by him.

BRADLEY, J.: I dissent from the opinion of the court in this case. I agree that the legislature of South Carolina meant the same thing by the expression " notes of specie-paying banks" and the expression " notes of banks payable in specie," or an equivalent phrase. But, in my judgment, it was meant by both expressions to indicate " notes of banks actually paying specie."

The other questions in the case were not raised or considered and need not be adverted to.

Mr. Justice SWAYNE did not sit in this case.