**SOUTH AFRICAN AIRWAYS,**
Petitioner,

v.

**Elizabeth H. DOLE, Secretary, U.S. Department of Transportation, Respondent.**

No. 86–1620.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 12, 1987.

Decided April 24, 1987.

Thomas J. Whalen, with whom Moffett B. Roller, Robert P. Silverberg, and Quentin Crommelin, Jr., Washington, D.C., were on brief, for petitioner.

Kenneth N. Weinstein, Deputy Asst. Gen. Counsel for Litigation, U.S. Dept. of Transp., with whom Thomas L. Ray, Senior Trial Atty., U.S. Dept. of Transp. and Robert B. Nicholson and David Seidman, Attys., U.S. Dept. of Justice, Washington, D.C., were on brief, for respondent.

William L. Robinson, Washington, D.C., and Goler T. Butcher were on brief for amici curiae Senator Edward Kennedy, et al., urging affirmance.

Before EDWARDS, SILBERMAN and BUCKLEY, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Petitioner South African Airways ("SAA") asks this court to set aside an order issued on October 31, 1986 by the

Secretary of Transportation revoking its permit to provide air service between the United States and South Africa. The order was issued pursuant to section 306(a) of the Comprehensive Anti-Apartheid Act of 1986, which directed the revocation of the right of any designee of the South African government to provide air service pursuant to the terms of an executive agreement between the United States and South Africa dated May 23, 1947 ("Agreement").[1]

Petitioner challenges the Secretary of Transportation's order on the principal grounds that as the immediate revocation of its permit was neither allowed by the Agreement (which remains in effect at least until October 1987) nor required by the Anti-Apartheid Act, the order violates both a provision of the Federal Aviation Act directing the Secretary of Transportation to observe international agreements and Supreme Court precedent requiring that statutes and executive agreements be interpreted, where possible, so as to give effect to both.

We reject these arguments because we conclude that Congress intended the immediate suspension of the rights enjoyed by SAA pursuant to the Agreement. As Congress has authority to "regulate Commerce with foreign Nations" and to "make all Laws which shall be necessary" for the exercise of that authority, section 306(a) of the Act overrides any provision of the Agreement or of the Federal Aviation Act with which it may be inconsistent.

### I. FACTUAL BACKGROUND

In October 1986, Congress enacted the Comprehensive Anti-Apartheid Act of 1986, Pub.L. No. 99-440, 100 Stat. 1086 ("Anti-Apartheid Act" or "Act"). Section 306(b)(1) of the Act directs the Secretary of State to "terminate the Agreement Between the Government of the United States of America and the Government of the Union of South Africa Relating to Air Ser-

vices Between Their Respective Territories, signed May 23, 1947, in accordance with the provisions of that agreement." Article XI of the Agreement provides for its termination upon one year's notice given by either party. Agreement, 61 Stat. at 3061. The Agreement also specifies limited conditions under which permits issued pursuant to the Agreement may be revoked. Agreement, art. VI, 61 Stat. at 3059-60. Section 306(a)(2) of the Act, which was offered in the Senate as a floor amendment, provides:

> Ten days after the enactment of this Act, the President shall direct the Secretary of Transportation to revoke the right of any air carrier designated by the Government of South Africa under the Agreement to provide service pursuant to the Agreement.

On October 10, 1986, the Secretary of State delivered the one-year termination notice to the South African Ambassador, and seventeen days later the President issued Executive Order 12,571 directing the Secretary of Transportation ("Secretary") to take the steps specified in section 306(a)(2) of the Act. Exec. Order No. 12,571, 51 Fed.Reg. 39,505 (1986). The Secretary thereupon issued Department of Transportation ("DOT") Final Order 86-11-29 ("Final Order") in which she initiated the steps required to effect an immediate revocation of South African Airways' permit. As required by section 801(a) of the Federal Aviation Act of 1958 ("Aviation Act"), 49 U.S.C. app. § 1461(a) (1982), the Final Order was transmitted to the President for review, at which point he could have exercised his prerogative under that section to disapprove the Final Order on foreign policy or national security grounds. He declined to do so, and SAA's permit was accordingly revoked effective November 16, 1986.

SAA challenges the Secretary's action as not required by the Act, as in violation of

---

1. Agreement between the Government of the United States of America and the Government of the Union of South Africa Relating to Air Services Between Their Respective Territories, May 23, 1947, 61 Stat. 3057, T.I.A.S. No. 1639, *as amended by* Agreement between the United

States of America and the Union of South Africa, Nov. 2, 1953, 4 U.S.T. 2205, T.I.A.S. No. 2870, and Air Transport Services Agreement, June 28, 1968, United States-South Africa, 19 U.S.T. 5193, T.I.A.S. No. 6512 (substituting "Republic" for "Union" throughout Agreement, as amended).

the Agreement, and consequently, both in conflict with Supreme Court precedent and illegal under section 1102(a) of the Aviation Act, which provides:

> In exercising and performing their powers and duties under this chapter, the [Civil Aeronautics] Board and the Secretary of Transportation shall do so consistently with any obligation assumed by the United States in any treaty, convention, or agreement that may be in force between the United States and any foreign country....

49 U.S.C. app. § 1502(a) (1982).

In response, the Secretary challenges the statutory jurisdiction of this court to review the Final Order, questions the propriety of such a review under the "political question" doctrine, and asserts the correctness of her determination that section 306(a)(2) required her to terminate SAA's permit authority promptly without awaiting the expiration of the Agreement.

## II. ANALYSIS

### A. *Jurisdiction*

#### 1. Statutory

■ This court has jurisdiction to review the Final Order under section 1006 of the Aviation Act, 49 U.S.C. app. § 1486 (1982). Section 1006, as codified, provides:

> Any order, affirmative or negative, issued by the Board or Secretary of Transportation under this chapter, except any order in respect of any foreign air carrier subject to the approval of the President as provided in section 1461 of this Appendix, shall be subject to review by the courts of appeals of the United States or the United States Court of Appeals for the District of Columbia....

49 U.S.C. app. § 1486(a) (1982).

The applicable language of section 1461, as amended by section 34 of the Airline Deregulation Act of 1978, Pub.L. No. 95–504, 92 Stat. 1705, 1740 ("Deregulation Act"), in turn provides:

> [R]evocation of ... any permit issuable to any foreign air carrier ... shall be presented to the President for review. The President shall have the right to disapprove any such [DOT] action concerning such ... permits solely upon the basis of foreign relations or national defense considerations which are within the President's jurisdiction, but not upon the basis of economic or carrier selection considerations.... Any such [DOT] action not disapproved ... shall take effect as action of the [DOT], not the President, and as such shall be subject to judicial review as provided in section 1486 of this Appendix.

49 U.S.C. app. § 1461(a) (1982).

In the Deregulation Act, Congress amended section 1461(a) in such a way as to make clear its intention that decisions of the Civil Aeronautics Board (and now the Secretary of Transportation) are not to be subject to the affirmative approval of the President as they previously had been under section 1461 prior to its amendment. *See* H.R.Rep. No. 1211, 95th Cong., 2d Sess. 61 (1978) (showing both the original and amended versions of section 1461). Whereas the original text provided that "any permit issuable to any foreign air carrier ... shall be subject to the approval of the President," with no restriction on the President's discretion, the new scheme allocates a much narrower role to the President. *See id.* at 19. The President may still disapprove such decisions, but only "upon the basis of foreign relations or national defense considerations which are within the President's jurisdiction." 49 U.S.C. app. § 1461(a) (1982) (as amended by the Deregulation Act).

Thus when the Secretary forwarded the Final Order to the White House, she was submitting it not for "the approval of the President as provided in section 1461," 49 U.S.C. app. § 1486(a) (1982), but for his *review* and possible disapproval for foreign policy and/or national defense considerations. Consequently, as the Final Order was not "subject to the approval of the President as provided in section 1461," it is subject to review by this court. Furthermore, even if we were to equate "subject to approval" with "subject to disapproval," the order would still be reviewable by this court because section 1461(a) stipulates

that if a DOT action is not disapproved, it "shall take effect as action of [DOT], not of the President, and as such shall be subject to judicial review as provided in section 1486 of this Appendix." 49 U.S.C. app. § 1461(a) (1982).

#### 2. Political Question

■ The Secretary reminds us that "matters 'vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations ... are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" *Holmes v. Laird,* 459 F.2d 1211, 1215 (D.C.Cir.), *cert. denied,* 409 U.S. 869, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972) (quoting *Harisiades v. Shaughnessy,* 342 U.S. 580, 588–89, 72 S.Ct. 512, 518–19, 96 L.Ed. 586 (1952)). Nevertheless, the Supreme Court has also noted that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker v. Carr,* 369 U.S. 186, 211, 82 S.Ct. 691, 707, 7 L.Ed.2d 663 (1962). "[T]he courts have the authority to construe treaties and executive agreements, and it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts." *Japan Whaling Ass'n v. American Cetacean Soc'y,* — U.S. —, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166 (1986) (construing *Baker v. Carr*).

It is clear that we have the competence to interpret the meaning of section 306(a)(2) of the Anti-Apartheid Act and to assess its intended impact on the permit granted SAA pursuant to the Agreement. The question we must consider, therefore, is whether in doing so we would trespass on territory reserved to the political branches for constitutional or prudential reasons. For guidance in this matter, we look to *Baker v. Carr:*

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impos-

sibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217, 82 S.Ct. at 710. On applying these factors to the case before us, we see no reason to conclude it is nonjusticiable. The text of the Constitution does not commit the subject matter to a political department, nor is there a lack of judicially discoverable and manageable standards for resolving the narrow issues before us. Our decision does not require an initial policy determination of a kind clearly reserved for nonjudicial discretion; it need not express a lack of the respect due coordinate branches of government; and in reaching the issues before us, we are not bound by a political decision already made. Finally, we see no risk that we will cause embarrassment through a proliferation of pronouncements on a sensitive matter of foreign policy.

As Justice White stated in *Japan Whaling Ass'n,* "under the Constitution, one of the judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones." 106 S.Ct. at 2866. As we find no constitutional or prudential bar to our construction of section 306(a), we conclude that this case presents a justiciable controversy.

#### B. *Interpretation and Application of Section 306(a)(2)*

We now address petitioner's principal argument; namely, that because section 306(a)(2) does not require the immediate revocation of SAA's permit, and because such a revocation violates provisions of the Agreement, the Secretary is required both by Supreme Court precedent, *Murray v. The Schooner Charming Betsy,* 6 U.S. (2

Cranch) 64, 118, 2 L.Ed. 208 (1804) ("[A]n act of congress ought never to be construed to violate the law of nations if any other possible construction remains...."), and by section 1102(a) of the Aviation Act to adopt an interpretation of section 306(a) that does not conflict with the provisions of the Agreement. Petitioner's argument may be broken down into three distinct claims: (1) immediate revocation is not required by the Act; (2) as immediate revocation entails a violation of the Agreement, such a revocation is impermissible under the applicable principle of statutory construction; and (3) the Secretary is bound by section 1102 of the Aviation Act to construe section 306(a)(2) consistently with the permit revocation provisions of the Agreement.

### 1. Timing of Revocation

█ Petitioner argues that although section 306(a)(2) required the President ten days after the Act's enactment to direct the Secretary to revoke SAA's permit, the section is silent as to when such revocation is to take place. Therefore, the Secretary could have timed the actual suspension of the permit to coincide with the termination of the Agreement. While this is true in the literal sense, it is impossible to reconcile such a construction with other provisions of section 306 that compel the conclusion that Congress intended to terminate air service to the United States by South African carriers without regard to the one-year notice required for termination of the Agreement. Subsection 306(a)(1) required the President to *"immediately* notify" (emphasis added) the South African government of his intention to suspend such service, and subsection 306(a)(2) called for him to direct the Secretary ten days later to revoke the right of any carrier designated by the government of South Africa to provide air service pursuant to the Agreement. Given the evident urgency of those instructions, it is hard to believe that Congress intended the Secretary to wait another 365 days before actually suspending petitioner's permit.

Furthermore, both the circumstances of the enactment of section 306(a) and the accompanying debate make it impossible to reach any conclusion other than that Congress intended the expeditious suspension of SAA's permit. In its original form, section 306 went no further than to direct termination of the Agreement on its own terms. Therefore, the actual suspension of SAA's landing rights would not have occurred for another year. It was for the express purpose of accelerating that suspension that Senators Sarbanes and Kassebaum introduced section 306(a) as an amendment to the version of the Anti-Apartheid Act submitted by the Senate Foreign Relations Committee. In presenting the amendment, Senator Sarbanes stated:

> The amendment that the Senator from Kansas and I have offered would bring a suspension of air service 10 days after the enactment of the legislation. It would have the President notify South African authorities of his intention to suspend and 10 days later, the suspension would take effect.

132 Cong.Rec. S11,712 (daily ed. Aug. 14, 1986).

Although senators spoke both in favor of and against the amendment, none questioned that its effect would be immediate. Committee Chairman Lugar, for example, strongly opposed the amendment on the explicit ground that in his judgment the revocation would violate the Agreement. At the same time, he reiterated his approval of the Act's original provision, in what is now section 306(b), that would have limited the sanction to giving South Africa the one year's notice of termination required by the Agreement. 132 Cong.Rec. S11,714. Thus his subsequent vote to table the amendment could only have confirmed his understanding of the immediacy of its effect.

We conclude that the clear meaning of the amendment coupled with the absence of any contrary view in the legislative record requires the conclusion that Congress intended the Secretary to give immediate effect to its mandate.

### 2. Reconciliation of Section 306(a) and the Agreement

█ SAA argues that notwithstanding the evident meaning of section 306 and its

legislative history, Supreme Court precedent nevertheless requires that it be construed in a manner that will not require the United States to violate its obligations under an executive agreement. SAA points out that Article VI of the Agreement specifies the circumstances under which a permit may be revoked and contends that this court must construe section 306 in a manner consistent with the permit revocation provision of the Agreement.

In debate Senator Lugar asserted that the Sarbanes amendment would require this country to violate the Agreement, and based his opposition to its adoption on this interpretation. Senator Sarbanes, on the other hand, argued that his amendment would not breach the Agreement: "[I]t is my contention that we are not unilaterally abrogating the agreement. On the contrary we are working within the parameters of the agreement." 132 Cong.Rec. S11,713–14. Senator Sarbanes argued that South Africa had failed to implement an "objective" expressed in the Agreement, namely, "to 'foster and encourage the widest possible distribution of the benefits of air travel for the [sic] good of mankind ... and to stimulate international [sic] travel as a means of promoting friendly understanding and good will among peoples [sic].'" 132 Cong.Rec. S11,712 (quoting Agreement Annex § IV(A), 61 Stat. at 3062).

Whatever the merits of this exchange between Senators Lugar and Sarbanes, there is no indication in the legislative history to suggest that in adopting the Anti-Apartheid Act as amended, Congress intended to abrogate any provision of the Agreement. Nor must we decide whether section 306(a) in fact violates any such provision. *Cf. Whitney v. Robertson*, 124 U.S. 190, 195, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888) ("[W]hen a law is clear in its provisions, its validity cannot be assailed before the courts for want of conformity to stipulations of a previous treaty not already executed.... The duty of the courts is to construe and give effect to the latest expression of the sovereign will."). Nevertheless, for the narrow purpose of addressing petitioner's reliance on a principle of statutory construction, we will assume, *arguendo*, that the mandate in section 306(a)(2) does in fact violate the Agreement.

If petitioner's construction of section 306(a)(2) were permissible, the lack of an express congressional intent to abrogate the permit revocation provision of the Agreement would lend support to SAA's position.[2] Since the days of Chief Justice Marshall, the Supreme Court has consistently held that congressional statutes must be construed wherever possible in a manner that will not require the United States "to violate the law of nations." *The Schooner Charming Betsy*, 6 U.S. (2 Cranch) at 118 (quoted in *Weinberger v. Rossi*, 456 U.S. 25, 32, 102 S.Ct. 1510, 1515, 71 L.Ed.2d 715 (1982)). The Court's extreme reluctance to find a conflict between an act of Congress and a pre-existing international agreement of the United States finds eloquent expression in *Chew Heong v. United States*, 112 U.S. 536, 5 S.Ct. 255, 26 L.Ed. 770 (1884):

> "There would no longer be any security," says Vattel, "no longer any commerce between mankind, if [nations] did not think themselves obliged to keep faith with each other, and to perform their promises." Vattel, Book 2, ch. 12. And as sovereign nations, acknowledging no

2. Petitioner relies heavily on the Court's reasoning in *United States v. Lee Yen Tai*, 185 U.S. 213, 221, 22 S.Ct. 629, 632, 46 L.Ed. 878 (1902) ("the purpose by statute to abrogate a treaty or any designated part of a treaty ... must not be lightly assumed, but must appear clearly and distinctly from the words used in the statute"), and *Weinberger v. Rossi*, 456 U.S. 25, 35, 102 S.Ct. 1510, 1517, 71 L.Ed.2d 715 (1982) ("affirmative congressional expression [is] necessary to evidence an intent to abrogate provisions in 13 international agreements"). Both of these cases can be distinguished; in neither case did the Court face an unambiguous congressional mandate to do something which in turn *might* abrogate U.S. international obligations. As we mentioned earlier, we do not decide whether the Anti-Apartheid Act does in fact abrogate terms of the Agreement. Furthermore, even if the Act did effect an abrogation, the Court's reasoning in *Lee Yen Tai* and *Weinberger v. Rossi* cannot defeat the unambiguous statutory mandate before us now.

superior, cannot be compelled to accept any interpretation, however just and reasonable, "the faith of treaties constitutes in this respect all the security of contracting powers." Ib. ch. 17.... Aside from the duty imposed by the Constitution to respect treaty stipulations when they become the subject of judicial proceedings, the court cannot be unmindful of the fact, that the honor of the government and people of the United States is involved in every inquiry whether rights secured by such stipulations shall be recognized and protected.

*Id.* at 539–40, 5 S.Ct. at 256.

The Court in *Chew Heong* compared the abrogation of a treaty through an act of Congress to the repeal of one statute by another, noting that even in the case of statutes "whose repeal or modification involves no question of good faith with the government or people of other countries, the rule is well settled that repeals by implication are not favored, and are never admitted where the former can stand with the new act." *Id.* at 549, 5 S.Ct. at 260. The Court went on to suggest the circumstances that will permit such implied repeal:

"[T]here must be a positive repugnancy between the provisions of the new laws and those of the old, and even then the old law is repealed by implication only *pro tanto*, to the extent of the repugnancy." ... "[I]t must appear that the later provision is certainly and clearly in hostility to the former. If, by any reasonable construction, the two statutes can stand together, they must so stand. If harmony is impossible, and only in that event, the former law is repealed in part, [sic] or wholly, as the case may be."

*Id.* at 549–50, 5 S.Ct. at 260 (quoting *Wood v. United States*, 41 U.S. (16 Pet.) 342, 362–63, 10 L.Ed. 987 (1842), and *State v. Stoll*, 84 U.S. (17 Wall.) 425, 431, 21 L.Ed. 650 (1873)).

As we have noted, however, the purpose of Congress in adopting the Sarbanes amendment was unambiguous. Therefore, if there is in fact "a positive repugnancy" between section 306(a) of the Anti-Apar-theid Act and Article VI of the Agreement, the latter must yield. "[S]o far as the provisions of [an] act [of Congress are] in conflict with any treaty, they must prevail in all courts of this country...." *Whitney v. Robertson*, 124 U.S. at 195, 8 S.Ct. at 459. Furthermore, "it is wholly immaterial to inquire whether by the act ... [Congress] has departed from the [Agreement] or not, or *whether such departure was by accident or design....*" *Id.* (emphasis added).

Congress has express constitutional powers to "regulate Commerce with foreign Nations" and to "make all Laws which shall be necessary and proper for carrying into Execution [such] Powers." U.S. Const. art. I, § 8. As this court has noted, "Under our constitutional scheme, Congress can denounce treaties if it sees fit to do so, and there is nothing the other branches of government can do about it." *Diggs v. Shultz*, 470 F.2d 461, 466 (D.C.Cir. 1972), *cert. denied*, 411 U.S. 931, 93 S.Ct. 1897, 36 L.Ed.2d 390 (1973).

3. The Aviation Act's General Prohibition

■ As we conclude that section 306(a)(2) supersedes whatever provisions of the Agreement may be in conflict with that section, so must it supersede, to the degree required, the Secretary's general duty under section 1102 of the Aviation Act, 49 U.S.C. § 1502(a) (1982), to exercise her powers "consistently with any obligations assumed by the United States in any treaty, convention, or agreement that may be in force between the United States and any foreign country." Section 306(a)(2) of the Anti-Apartheid Act is a very specific congressional directive. "Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Morton v. Mancari*, 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974) (citations omitted). Petitioner's argument that the Secretary was bound by section 1102 of the Aviation Act to construe section 306(a)(2) consistently with the permit revocation provisions of the Agreement is therefore without merit.

### 4. Remaining Argument

■ We have also considered, but found without merit, petitioner's argument that, by its own terms, section 306 of the Anti-Apartheid Act does not apply to SAA. Section 306(a)(2) directs the revocation of "the right of any air carrier designated by the Government of South Africa under the Agreement to provide service pursuant to the Agreement." Section 306(d), as amended by the Act of November 7, 1986, Pub.L. No. 99–631, 100 Stat. 3516, provides that the term "air carrier" in section 306 is to be given the meaning of that term in section 101 of the Aviation Act, 49 U.S.C. § 1301 (1982). Section 101, in turn, defines "air carrier" as "any citizen of the United States who undertakes, whether directly or indirectly or by a lease or any other arrangement, to engage in air transportation...." 49 U.S.C. app. § 1301(3) (1982). Accordingly, petitioner claims that SAA is not subject to the terms of section 306(a)(2) because it is not a "citizen of the United States"; and therefore, that it should not have been the object of the Final Order implementing that section. We reject this ingenious interpretation of the Act because in context it is clear that the words "air carrier" apply explicitly to a South African carrier.

As "air carrier" is immediately followed by "designated by the Government of South Africa under the Agreement," it is clear that we are not dealing with U.S. citizens. The Agreement requires that designated air carriers be owned or controlled by nationals of the designating country or else the permit issued by the other country may be revoked:

> Each contracting party reserves the right to withhold or revoke a certificate or permit to an air carrier designated by the other contracting party in the event that it is not satisfied that substantial ownership and effective control of such carrier are vested in nationals of the other contracting party....

Agreement, art. VI, 61 Stat. at 3059. Accordingly, we read "air carrier designated by the Government of South Africa under the Agreement" as clearly distinguishable from "air carrier" standing alone.

### III. CONCLUSION

The Secretary correctly interpreted section 306(a)(2) of the Anti-Apartheid Act. Section 306(a)(2) unambiguously calls for expedited revocation of any permit issued to a South African air carrier pursuant to the Agreement whether or not the revocation may later be found to constitute a breach of the Agreement. The petition to set aside DOT Final Order 86–11–29 is therefore

*Denied.*