# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 8, 2005          Decided July 8, 2005

No. 04-1030

AEROLINEAS ARGENTINAS S.A.,
PETITIONER

v.

U.S. DEPARTMENT OF TRANSPORTATION,
RESPONDENT

AMERICAN AIRLINES, INC., ET AL.,
INTERVENORS

———

On Petition for Review of an Order of the
United States Department of Transportation

———

*John N. Romans* argued the cause for petitioner. With him on the briefs were *Alexander C. Vincent* and *Thomas G. Corcoran, Jr.*

*Dale C. Andrews*, Deputy Assistant General Counsel, U.S. Department of Transportation, argued the cause for respondent. With him on the brief were *Robert H. Pate, III*, Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *Steven J. Mintz*, Attorneys, *Jeffrey A. Rosen*, General Counsel, U.S. Department of Transportation, *Paul M. Geier*, Assistant General Counsel, and *Thomas L. Ray*.

*Carl B. Nelson, Jr.*, *David E. Short*, and *Jeffrey A. Manley* were on the brief for intervenor.

Before: GINSBURG, *Chief Judge*, and HENDERSON and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*: Aerolineas Argentinas petitions for review of an order of the Department of Transportation (DoT) conditioning the airline's permit to provide air transportation to and from the United States upon its paying into escrow "the difference between what it actually pays [in user charges] at Buenos Aires Ezeiza airport and the higher amounts" that United States carriers are required to pay at that airport. Aerolineas acknowledges that it is paying user charges for international flights that are roughly one third of what United States carriers are being charged, but it argues that because the disparity stems not from any intentional discrimination on the part of the Government of Argentina, but rather from "conflicting [Argentine] judicial decisions," the DoT abused its discretion by treating the discrepancy as an "unreasonable discriminatory ... practice against" the United States carriers within the condemnation of the International Air Transportation Fair Competitive Practices Act, 49 U.S.C. § 41310(c)(1)(A). In any event, argues Aerolineas, because neither the Argentine Congress nor the Executive can control the decisions of the Argentine Judiciary, the DoT's countermeasure will not eliminate the difference and was therefore arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

For its part, the DoT argues first that 49 U.S.C. § 46110 deprives the court of jurisdiction to review the challenged order because it comes within the exception to reviewability for orders

"relat[ing] to a foreign air carrier [and] subject to disapproval by the President." On the merits, the DoT argues the order was within its authority under § 41310 and easily withstands the deferential review called for under the APA.

Because the DoT's order is no longer subject to the President's disapproval, we hold the court has jurisdiction to entertain Aerolineas' petition, which we deny on its merits.

## I. Background

In early 2002 the Government of Argentina delinked its peso from the U.S. dollar, whereupon the value of the peso quickly fell to about 33 U.S. cents. In an attempt to mitigate the ensuing panic, the Argentine Congress passed a law requiring that public service tariffs, including airport user fees, which were formerly denominated in dollars, be paid in pesos as though each peso were still worth $1.00, that is, at a one-to-one rate. The Argentine Executive, however, issued a Decree purporting to supersede that law and requiring that airport user charges for international flights -- for landing, parking, and air traffic control -- at Buenos Aires International Airport (Aeropuerto Internacional Ministro Pistarini de Ezeiza, or Ezeiza) be paid in dollars at the floating exchange rate of roughly three-to-one.

Several airlines challenged the constitutionality of the Decree in the Argentine courts, and it is the divergent results of those actions that gave rise to this case. First, Aerolineas obtained a preliminary injunction against enforcement of the Decree, thereby allowing it to pay the airport charges at the one-to-one rate. Then carriers from the United States and other foreign countries sought, but were denied, the same relief in a different Argentine court. As a result, since September 2002 Aerolineas has been paying user charges at Ezeiza that are

roughly one third of what the United States carriers must pay for the same services.

Four United States carriers filed complaints with the DoT pursuant to 49 U.S.C. § 41310(d)(1).[*] The discrepancy in charges, they argued, put the Government of Argentina in violation of its bilateral agreement with the United States that "[a]irlines shall not be required to pay charges higher than those paid by the airlines of the [other] party," Air Transport Services Agreement Between the Governments of the United States of America and the Republic of Argentina, Oct. 22, 1985, T.I.A.S. No. 11262, and therefore constituted an "unreasonable discriminatory ... practice against" the United States carriers, 49 U.S.C. § 41310(c)(1)(A). The DoT agreed, concluding "the imposition of higher fees at Ezeiza airport on U.S. carriers than those paid by Aerolineas Argentinas constitutes, on its face, the type of activity that 49 U.S.C. § 41310 was intended to reach." After diplomatic efforts to avoid a confrontation failed, the DoT imposed a countermeasure: Aerolineas' permit to operate in the United States was conditioned upon the airline's depositing in an escrow account in the United States the difference, for each of its international flights landing at Ezeiza, between the user fee it pays and the fee that United States carriers pay there.

Shortly thereafter Aerolineas moved the DoT to stay its order because an appellate court in Argentina had modified the preliminary injunction granted in its favor and required the carrier to pay the same difference (that is, two pesos on the

---

[*]49 U.S.C. § 41310(d)(1) provides: "An air carrier ... may file a complaint under [§ 41310(c)]," which authorizes the DoT to "take actions ... in the public interest to eliminate an activity of a government of a foreign country" that is "an unjustifiable or unreasonable discriminatory, predatory, or anticompetitive practice against an air carrier."

dollar) into an escrow account in Argentina pending final resolution on the merits of its constitutional challenge to the Decree. The DoT refused to stay its order because Aerolineas had appealed the modification to the Supreme Court of Argentina and, in the meantime, was not making escrow payments in Argentina. Aerolineas then petitioned this court for review of the DoT's order.

## II. Analysis

Aerolineas argues first that conflicting decisions by the courts of Argentina do not amount to a "discriminatory, predatory, or anticompetitive practice" by the Government of Argentina against the United States carriers within the meaning of 49 U.S.C. § 41310(c)(1)(A) and, in any event, the DoT's countermeasure should be set aside as arbitrary and capricious, 5 U.S.C. § 706(2), because in Argentina, as here, neither the Congress nor the Executive can dictate the decisions of the Judiciary. Before turning to those contentions, however, we must address the DoT's objection that we are without jurisdiction to review the order.

## A. Jurisdiction

Under 49 U.S.C. § 41307, the Secretary of Transportation was required to submit his order to the President for review as a "decision [to] ... amend ... a permit ... authorizing a foreign air carrier ... to provide foreign air transportation." Under that section:

> The President may disapprove the decision of the Secretary only if the reason for disapproval is based on foreign relations or national defense considerations that are under the jurisdiction of the President. The President may not disapprove ... if the reason is economic .... A decision of the

Secretary --

...

> (2)(A) takes effect as a decision of the Secretary if the President does not disapprove the decision not later than 60 days after the decision is submitted to the President; and (B) when effective, may be reviewed judicially under section 46110 ....

Section 46110 makes reviewable in this court any order of the Department of Transportation "[e]xcept for an order related to a foreign air carrier subject to disapproval by the President under section 41307."

The DoT argues its order to Aerolineas comes within the exception in § 46110 and is therefore unreviewable. Aerolineas responds as follows: (1) The DoT's decision was "economic," and because "the President may not disapprove 'economic' decisions" the order was not "subject to disapproval by the President"; and (2) even if the order was initially subject to disapproval by the President, because he did not disapprove it within the 60 days provided therefor, and the order has since "take[n] effect as a decision of the Secretary" that is no longer subject to presidential disapproval, it is now subject to judicial review.

Aerolineas' first "argument" is really a conclusion, for which it offers no support whatsoever. We reject it in kind.

Aerolineas' second argument gains traction from *South African Airways v. Dole*, 817 F.2d 119, 123 (D.C. Cir. 1987), in which we considered the predecessor to § 46110, and concluded that "if a DOT action is not disapproved [by the President, then] it 'shall take effect as [an] action of [the DoT], not of the

President, and as such shall be subject to judicial review as provided in section 1486 of this Appendix.'  49 U.S.C. app. § 1461(a) (1982)."

The DoT points out that § 1486 differed from the current § 46110 in that it excepted from judicial review any order relating to a foreign air carrier "subject to the approval" -- not the "disapproval" -- of the President; the order at issue in that case was by statute made subject only to the disapproval of the President, and we therefore concluded it was not within the exception to judicial review.  817 F.2d at 122.  Because the order under review in this case was subject to the "disapproval" of the President, pursuant to the exception in § 46110, the DoT argues the result in this case should be different.  The DoT fails to appreciate, however, that in the prior case we went on to explain that "even if we were to equate 'subject to approval' with 'subject to disapproval,'" -- that is, even if the exception to reviewability in § 1486 were the same as the exception in § 46110 -- "the order would still be reviewable."  *Id*.  That leaves the DoT with no basis upon which to distinguish *South African Airways*.

We now make explicit what was necessarily implicit in *South African Airways*, namely, that § 46110 does not permanently preclude judicial review of an order "relat[ing] to a foreign air carrier" merely because the order was initially "subject to disapproval by the President."  When an order is no longer "subject to disapproval by the President," there is no longer any reason to shield it from judicial scrutiny, or so the Congress apparently concluded.  Here, the order was submitted for the President's review on November 19, 2003, and on November 25 the President's designee[*] notified the DoT that he

---

[*] By Executive Order 12597 the President delegated this authority to the Secretary, who in turn delegated it to the

did not intend to disapprove it. Even absent such notification, "60 days after the decision is submitted to the President" or his designee, if not disapproved the order "takes effect as a decision of the Secretary" and, "when effective, may be reviewed judicially under section 46110." 49 U.S.C. § 41307(2)(A)&(B).

If the Congress had intended permanently to shield from judicial review all orders initially "subject to disapproval by the President," then it would have said so. The more natural meaning of the phrase "subject to disapproval" is as a temporal limitation; a court may not review an order "relating to a foreign air carrier" as long as that order is "subject to disapproval by the President." The lack of presidential disapproval, however, indicates only that the order is not harmful to the foreign relations or defense of the Nation. We should not lightly presume the Congress intended to grant the DoT an unreviewable discretion to engage in otherwise noxious decisionmaking. *See Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (noting the "strong presumption of reviewability under the [APA]"). Accordingly, as we held in *South African Airways*, "if a DOT action is not disapproved, it ... shall be subject to judicial review" pursuant to the APA. 817 F.2d at 123.[*]

General Counsel of the DoT. 49 C.F.R. § 1.57(p).

[*] We recognize this interpretation of § 46110 leaves the exception to judicial review with only limited practical effect; despite the court's best efforts, judicial review could hardly be had in less than 60 days, nor would we ordinarily review an order before it "takes effect." 49 U.S.C. § 41307. It is the cumulative effect of several Acts of Congress, however, and not our decision today, that accounts for the limited sweep of the exception. The original version of the exception in what is now

B.  The Merits

Aerolineas argues "the plain language of § 41310 requires discriminatory intent," whereas "the current different rates being paid by different carriers is strictly ... fortuitous."  The DoT takes issue with the carrier's premise, arguing "it is irrelevant whether the foreign government's discriminatory activity was intentional."

No action taken by any branch of the Government of Argentina appears to have been aimed at disadvantaging United

---

§ 46110 was crafted prior to the Congress's having regularized judicial review of administrative action in the APA, *see* Pub. L. No. 75-706, June 23, 1938, 52 Stat. 1024 ("except any order in respect of any foreign air carrier subject to the approval of the President").  Meanwhile, § 41307 has been changed significantly over time:  An order "amend[ing] ... any permit issuable to any foreign air carrier" was originally made "subject to the approval of the President" without any limitation either of time or of the ground upon which he might reject it.  52 Stat. 1014.  Although all such orders had to be "submitted to the President before publication," *id*., another section provided that "all orders ... of the [then-Civil Aeronautics] Authority shall take effect within such reasonable time as the Authority may prescribe," 52 Stat. 1023.  Thus, it was apparently possible for an order to take effect while it was still subject to the President's "approval ... denial, transfer, amendment, cancellation or suspension," *Chicago & So. Air Lines v. Waterman S.S. Corp*., 333 U.S. 103, 109 (1948), and the exception precluded judicial review until such time as the President had acted.  Now the President's time to act has been cut short, but the order does not take effect until that time is up, leaving little if any time during which the exception bars judicial review.

States carriers.  Nevertheless, as the DoT explained in its order, "the Government of Argentina is a signatory to an agreement with ... the United States," which provides:

> User charges, imposed by the competent charging authority of the other Party shall be just, reasonable, and non-discriminatory.  Airlines shall not be required to pay charges higher than those paid by airlines of the charging Party.

The treaty makes no exception for "fortuitous" circumstances and contemplates no inquiry into the cause of higher charges or, indeed, whether it is within the power of a signatory government to eliminate that difference; it simply states "[a]irlines shall not be required to pay charges higher than those paid by airlines of the [other nation]," and thereby defines "non-discriminatory" in terms of impact, rather than intent.  Because Aerolineas does not dispute that it is paying only about one third of what the United States carriers are paying for international flights at Ezeiza, we can hardly say the DoT acted unreasonably in concluding the United States carriers are paying "charges higher" than their Argentine counterpart, contrary to the agreement between the Government of Argentina and the United States prohibiting "discriminatory" charges.

Whether the higher charges constitute an "unreasonable discriminatory ... practice" under § 41310(c) is a question committed to the DoT to answer "in the public interest," subject only to limited review by the President and to judicial review under the APA, *see* 5 U.S.C. § 706(2) (court shall "set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").  To the extent Aerolineas argues the DoT misconstrued § 41310, we must defer to the DoT's reasonable interpretation of that section.  *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843 (1984) ("[I]f the statute is silent or ambiguous with respect to the specific

issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute").

The DoT points out that "the words 'intentional' or 'intent' appear nowhere in the statut[e]," and we see no reason to think, in this context, the term "discriminatory" necessarily requires a showing of intent, as opposed merely to a disparate impact. *Cf. Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) ("Under a disparate-impact theory of discrimination, a facially neutral employment practice may be deemed illegally discriminatory without evidence of the employer's subjective intent to discriminate"). Absent such a requirement, Aerolineas offers no reason to believe the DoT acted unreasonably in concluding that charging Argentine and United States carriers different rates was an "unreasonable discriminatory ... practice" under § 41310(c).

C. The Countermeasure

Aerolineas also argues the DoT abused its discretion in adopting a countermeasure without "indicat[ing] just how assessing Aerolineas with additional fees will eliminate the alleged discriminatory activity." According to Aerolineas, because the Argentine Executive is not empowered to dictate the decisions of the Argentine Judiciary, the DoT's countermeasure will have no effect. As the DoT points out, however, the Executive could unilaterally eliminate the difference in user charges at Ezeiza merely by staying its own Decree.

Aerolineas' next argument, that the DoT may not "[take] it upon itself ... to level the playing field," is directly contrary to statute; § 41310(b) provides that "[i]f the discrimination is not ended in a reasonable time through negotiation, the [DoT] shall establish a compensating charge equal to the discriminatory charge." Whether this means the DoT might have taken the further step of passing Aerolineas' escrow payments through to

the United States carriers, we need not decide. The DoT was plainly authorized to levy the charge it imposed.

Finally, Aerolineas argues the DoT's order may itself prove to be "discriminatory" because Aerolineas, in the event it loses its appeal to the Supreme Court of Argentina, would "be in the position of paying a total of three pesos in Argentina and two to the DOT, making it the only airline that is paying at the rate of five" pesos per dollar for user charges on international flights at Ezeiza. The DoT's order, however, requires Aerolineas to pay into escrow in the United States only the difference between what it is paying for the use of Ezeiza and what United States carriers are paying. The DoT reasonably represents that, "[i]f circumstances ... change, and Aerolineas Argentinas in fact begins paying at the rate charged to other carriers, it will have every opportunity to bring this to the attention of the Department," where we trust it will find relief.

## III. Conclusion

For the foregoing reasons, the petition for review is

*Denied.*