# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 5, 2006        Decided December 15, 2006

No. 05-5352

THE FUND FOR ANIMALS, INC., ET AL.,
APPELLANTS

v.

DIRK KEMPTHORNE, SECRETARY OF THE INTERIOR, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 05cv00777)

Joshua R. Stebbins argued the cause for appellants. With him on the briefs were Howard M. Crystal and Eric R. Glitzenstein.

Kathryn E. Kovacs, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief was Ellen Durkee, Attorney, U.S. Department of Justice.

Douglas S. Burdin and Anna M. Seidman were on the brief for appellees Safari Club International, Safari Club International Foundation, and Ducks Unlimited.

Before: ROGERS, GARLAND and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

Concurring opinion filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge.* The United States is a party to international conventions with Canada and Mexico for the protection of migratory birds. Congress has implemented those conventions through the Migratory Bird Treaty Act, a statute first passed in 1918. The statute makes it unlawful to hunt or kill migratory birds "included in the terms of the conventions." 16 U.S.C. § 703(a). In 2001, this Court concluded that the migratory birds protected under the Act included the mute swan. *See Hill v. Norton*, 275 F.3d 98 (D.C. Cir. 2001).

After the *Hill* decision, Congress enacted the Migratory Bird Treaty Reform Act. The Reform Act amends the Migratory Bird Treaty Act so that the statute applies "only to migratory bird species that are native to the United States or its territories." 16 U.S.C. § 703(b)(1). As the parties here agree, the mute swan is *not* native to the United States or its territories. As a result, the amended statute by its terms no longer prohibits the hunting or killing of the mute swan.

The plaintiffs in this case have advanced a variety of arguments why the amended Migratory Bird Treaty Act nonetheless continues to protect mute swans. We reject plaintiffs' contentions. The text of the statute is plain: The amended Migratory Bird Treaty Act does not ban the hunting or killing of non-native migratory bird species, including mute swans.

3

I

1. In 1916, the United States entered into a convention with Canada for the protection of migratory birds; in 1936, the United States entered into a similar convention with Mexico. Convention for the Protection of Migratory Birds, U.S.-Gr. Brit., Aug. 16, 1916, 39 Stat. 1702; Convention for the Protection of Migratory Birds and Game Mammals, U.S.-Mex., Feb. 7, 1936, 50 Stat. 1311. *See generally Hill v. Norton*, 275 F.3d 98, 100-01 (D.C. Cir. 2001) (surveying those treaty provisions, as well as two later conventions with Japan and the former Soviet Union). The Canada and Mexico conventions expressly cover the family Anatidae. Canada Convention, art. I, § 1(a), 39 Stat. at 1702; Mexico Convention, art. IV, 50 Stat. at 1313. That family includes the mute swan, thought to be a European species originally brought to the United States for ornamental purposes. *Hill*, 275 F.3d at 99; *see* Draft List of Bird Species to Which the Migratory Bird Treaty Act Does Not Apply, 70 Fed. Reg. 372, 373-74 (Jan. 4, 2005) (surveying evidence of mute swan origin).

In 1918, Congress passed and President Wilson signed the Migratory Bird Treaty Act. The Act's prohibition has remained largely the same since enactment. Unless authorized by regulations administered by the Secretary of the Interior,

> it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export, any migratory bird, any part, nest, or egg of any such bird, or any product,

whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof, *included in the terms of the conventions . . . .*

16 U.S.C. § 703(a) (emphasis added); *see* Migratory Bird Treaty Act, ch. 128, 40 Stat. 755, 755 (1918) (statute as originally enacted).

Starting in the 1970s, the Secretary of the Interior regularly published a list of species protected under the Act. The list did not include the mute swan. A citizen eventually challenged the Secretary's decision not to protect the mute swan. In *Hill*, we concluded that the Secretary's interpretation of the Migratory Bird Treaty Act was not reasonable when measured against the statutory text: The statute covers birds "included in the terms of the conventions" themselves, and we stated that the Canada convention "undisputably include[s] mute swans." *Hill*, 275 F.3d at 104. Although the Secretary argued that the mute swan was not protected because it was not native to the United States, we stated that the Secretary pointed to "nothing in the statute, applicable treaties, or administrative record" to support an exclusion for non-native species. *Id.* at 105-06. The text of the Migratory Bird Treaty Act and the Canada convention's references to "swans" weighed against such an exclusion and meant that the Secretary's interpretation was not reasonable. *Id.* at 106. (The opinion focused solely on the Canada convention because it imposed the strictest limitation on the hunting or killing of migratory birds. *Id.* at 103-04.)

2. In 2004, after the *Hill* decision, Congress passed and President Bush signed the Migratory Bird Treaty Reform Act. *See* Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, Div. E, Title I, § 143, 118 Stat. 2809, 3071-72 (2004) (codified at 16 U.S.C. § 703). The Reform Act amended the

Migratory Bird Treaty Act's prohibition on killing or hunting migratory birds so that the statute "applies only to migratory bird species that are native to the United States or its territories." 16 U.S.C. § 703(b)(1). The Reform Act further defined the term "native to the United States or its territories" to mean "occurring in the United States or its territories as the result of natural biological or ecological processes." *Id.* § 703(b)(2)(A). And subject to certain exceptions not relevant here, the Reform Act provided that "a migratory bird species that occurs in the United States or its territories solely as a result of intentional or unintentional human-assisted introduction shall not be considered native to the United States or its territories . . . ." *Id.* § 703(b)(2)(B). Congress directed the Secretary of the Interior to issue within 90 days of the Reform Act's enactment and after public comment "a list of all nonnative, human-introduced bird species to which the Migratory Bird Treaty Act does not apply." Consolidated Appropriations Act, Div. E, Title I, § 143(c) (citation omitted).

The Reform Act also expressed Congress's apparent disagreement with this Court's *Hill* decision as to the meaning of the migratory bird conventions: "It is the sense of Congress that the language of this section is consistent with the intent and language of the 4 bilateral treaties implemented by this section." *Id.* § 143(d). In other words, Congress indicated its belief that the Canada convention and the other three migratory bird conventions did not cover non-native species such as the mute swan.

Consistent with the Reform Act, the Fish and Wildlife Service, which is part of the Department of the Interior, promptly published and sought comment on a draft list of non-native species that would not be protected under the statute. *See* Draft List of Bird Species to Which the Migratory Bird Treaty Act Does Not Apply, 70 Fed. Reg. 372 (Jan. 4, 2005). The list

excluded the mute swan from protection. *Id.* at 373-74. The Service pointed to the scientific and historical evidence that the species is not native to this continent. "All existing populations of the mute swan in North America," the Service noted, "are derived from introduced stocks that were released or escaped at different localities and in different years and eventually established feral populations." *Id.* at 373.

The Humane Society of the United States, an animal welfare organization, submitted comments opposing the Service's designation. The Service treated those comments as a petition for rulemaking under the Administrative Procedure Act to change the mute swan's designation, which the Service denied. *See* Final List of Bird Species to Which the Migratory Bird Treaty Act Does Not Apply, 70 Fed. Reg. 12,710, 12,713 (Mar. 15, 2005). The Service published its final rule in March 2005, and the list excluded mute swans. *Id*. at 12,714-15.

The Maryland Department of Natural Resources then informed the Humane Society of its intention to begin killing adult mute swans in the Chesapeake Bay in the spring of 2005. Maryland had previously concluded that such killing was necessary because the mute swan population, which had surged "dramatically between 1986 and 1999," now posed a danger to the bay ecosystem. WILDLIFE & HERITAGE SERV., MD. DEP'T OF NATURAL RES., MUTE SWANS IN MARYLAND: A STATEWIDE MANAGEMENT PLAN 4 (2003). Maryland determined that the mute swan population consumed and disrupted large quantities of underwater plants that "protect water quality . . . [,] prevent erosion," and provide food and shelter for fish, shellfish, invertebrates, and other birds indigenous to the Bay. *Id.* at 10; *see also Hill*, 275 F.3d at 99 (noting "information to suggest that mute swans cause ecological damage").

3. The Fund for Animals, Inc., is an affiliate of the Humane

Society. In April 2005, the Fund and three individuals sued the Secretary under the Administrative Procedure Act, 5 U.S.C. §§ 702, 706(2)(A). Plaintiffs conceded that the mute swan was not native to the United States or its territories. The complaint nonetheless challenged the Service's decision not to list the mute swan as protected, asserting that the statute continues to require protection of the mute swan. Complaint at 12-13, *Fund for Animals v. Norton*, 374 F. Supp. 2d 91 (D.D.C. 2005) (No. 05-cv-777). The complaint sought a court order that would, among other things, direct the Service "to notify the State of Maryland . . . that Mute Swans may not be killed" without a permit from the Service. *Id.* at 13. Plaintiffs also moved for a preliminary injunction. Three parties that aim to promote hunting as a means of wildlife conservation moved to intervene as defendants: the Safari Club International, the Safari Club International Foundation, and Ducks Unlimited. Those defendant-intervenors emphasized that the mute swans compete with and behave aggressively toward birds indigenous to the Chesapeake Bay – in other words, that the mute swans are harmful to the environment. *See Fund for Animals v. Norton*, 374 F. Supp. 2d 91, 93-94 (D.D.C. 2005).

After a hearing, the District Court denied the preliminary injunction. The District Court concluded that the "defendants' overwhelming likelihood of success on the merits outweighs any other equitable factors favoring plaintiffs." *Id.* at 93. The District Court stated that "nothing in the Reform Act itself appears ambiguous," and the Reform Act's terms showed "that Congress intended to modify the [Migratory Bird Treaty Act] to exclude nonnative species." *Id.* at 102. Even if the Reform Act conflicted with the migratory bird conventions with Canada and other nations, the District Court concluded the Reform Act controlled because "Congress clearly has the power to abrogate or modify a treaty or earlier legislation, and when it does so, that is the final word." *Id.* at 103.

At the parties' request, the District Court converted this ruling into a final judgment on the merits. *See* Fed. R. Civ. P. 65(a)(2). This appeal followed. We review de novo the legal question whether the Secretary's decision to exclude mute swans from protection was consistent with the Migratory Bird Treaty Act.

## II

Standing to sue is a threshold question. *See DaimlerChrysler Corp. v. Cuno*, 126 S. Ct. 1854, 1861 (2006). In *Hill*, we held that the plaintiff, a Maryland property owner who enjoyed the presence of mute swans on her property, satisfied the constitutional prerequisite for invoking federal jurisdiction – namely, injury in fact fairly traceable to the conduct of the defendants and redressable by judicial relief. 275 F.3d 98, 102-03 (D.C. Cir. 2001). The same is true here. Two of the individual plaintiffs are Maryland residents with mute swans on their property. Under *Hill*, those plaintiffs suffer injury in fact because of the Service's designation of the mute swan as a species not protected by the Migratory Bird Treaty Act. That action freed Maryland to kill a portion of the Chesapeake Bay mute swan population, which would include the swans on those residents' property. Judicial invalidation of the designation would restore protection to the mute swan and make Maryland's plan unlawful. The Maryland plaintiffs have standing. We therefore need not evaluate the standing of the third individual plaintiff, a Massachusetts resident who makes weekly visits to a pond inhabited by mute swans, or of the Fund itself.

## III

1. The Migratory Bird Treaty Act provides that, with certain exceptions, "it shall be unlawful . . . [to] hunt . . . [or] kill

. . . any migratory bird . . . included in the terms of the conventions." 16 U.S.C. § 703(a). Enacted in 2004, the Migratory Bird Treaty Reform Act amended this long-standing statutory prohibition on hunting or killing migratory birds to make clear that the statute "applies only to migratory bird species that are native to the United States or its territories." 16 U.S.C. § 703(b)(1). As the Secretary determined and the parties here agree, the mute swan is not a native migratory bird species. It follows, therefore, that the Migratory Bird Treaty Act does not protect the mute swan.

Plaintiffs argue that this approach is too straightforward, contending in essence that this provision of the Reform Act does not mean what it says. Their argument relies on the separate "sense of Congress" provision in the Reform Act, which states: "It is the sense of Congress that the language of this section is consistent with the intent and language of the 4 bilateral treaties implemented by this section." Consolidated Appropriations Act, Div. E, Title I, § 143(d).

Plaintiffs' creative attempt to weave ambiguity out of clarity goes as follows: Plaintiffs state that this Court was correct to conclude in *Hill v. Norton* that the migratory bird conventions cover the mute swan. 275 F.3d 98, 104 (D.C. Cir. 2001). Although the Reform Act on its face excludes the mute swan, plaintiffs point out that Congress also indicated its "sense" that the amended statute is consistent with the conventions. Given the apparent conflict between the conventions and the amended statute, together with Congress's stated belief that there is no such conflict, plaintiffs contend that the statute must be deemed ambiguous. And plaintiffs argue that we must therefore apply the canon of construction that ambiguous statutes should not be interpreted to abrogate a treaty (namely, the conventions' protection of the mute swan).

Plaintiffs' argument is mistaken at each turn. The statute is not ambiguous, and for that reason the canon against abrogation does not apply.

2. Plaintiffs base their argument that the statute is ambiguous on the sense of Congress provision in the Reform Act. Indeed, plaintiffs recognize that the statute is clear but for the sense of Congress provision. *See* Tr. of Oral Arg. 4. Plaintiffs' interpretation of the sense of Congress provision is incorrect. By setting forth its "sense" that the Reform Act is "consistent with" the migratory bird conventions, Congress merely suggested that it believes the conventions, as originally adopted, covered only native species of migratory birds. Read most naturally, the sense of Congress provision indicates nothing more than Congress's disagreement with this Court's 2001 decision in *Hill* (which had concluded that the Canada convention "undisputably include[s] mute swans," 275 F.3d at 104). The sense of Congress provision makes clear that the Reform Act was not an attempt to limit or back away from America's treaty obligations, but rather was a correction of what Congress believed to be an erroneous judicial interpretation of a treaty. In any event, Congress may or may not be correct in its interpretation of the conventions' original scope, but that is of no moment in this case. The sense of Congress provision does not in any way alter the plain text of the Reform Act's other provisions, which clearly and unambiguously provide that the Migratory Bird Treaty Act does not protect non-native species such as the mute swan.

Plaintiffs' interpretation of the sense of Congress provision would render the Reform Act meaningless, as plaintiffs candidly acknowledge. *See* Tr. of Oral Arg. 7. Even accepting that Congress on occasion may enact a statute that turns out to have no effect, courts presume that Congress has used its scarce legislative time to enact statutes that have some legal

consequence. *See Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 216 (1995) (interpretation that would leave a statute "utterly without effect" is "a result to be avoided if possible"); *see also* 2A NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 46:06 (6th ed. 2000) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error.") (footnotes omitted). That plaintiffs interpret the Reform Act to be an empty gesture is yet another indication that their submission is erroneous.

The Government also points out that plaintiffs' position is inconsistent with the Reform Act's legislative history, which contains evidence that Members of Congress specifically intended to exclude the mute swan and other non-native birds from the Migratory Bird Treaty Act's coverage. *See, e.g.*, S. REP. NO. 108-313, at 2-3 (2004); H.R. REP. NO. 108-520, at 5-6 (2004). On that point, however, plaintiffs persuasively respond that those legislative materials are of little value because the version of the legislation under consideration when the Senate and House reports were written did not yet include the sense of Congress provision. In fact, the Government concedes that "[n]o legislative history explains the addition of that provision to the Reform Act." Appellees' Br. at 35. We agree with plaintiffs that the legislative history cited by the Government is not helpful in construing this statute. The Government's legislative history argument in this case – which relies on pieces of legislative history unconnected to the key language in the statute – is a good example of misusing snippets of legislative history from a dynamic and evolving legislative drafting process. *Cf. Bd. of Educ. of Westside Cmty. Sch. (Dist. 66) v. Mergens*, 496 U.S. 226, 238 (1990).

Given our interpretation of the sense of Congress provision,

we need not consider the Government's argument that sense of Congress provisions are generally considered to be no more than non-binding statements of policy. *See Yang v. Cal. Dep't of Soc. Servs.*, 183 F.3d 953, 959 (9th Cir. 1999) ("[T]he courts rely on the sense of Congress provisions to buttress interpretations of other mandatory provisions and do not interpret them as creating any rights or duties by themselves."); *Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 994-95 (1st Cir. 1992); *Trojan Techs., Inc. v. Pennsylvania*, 916 F.2d 903, 908-09 (3d Cir. 1990).

3. In the second part of their argument, plaintiffs cite the canon of construction that ambiguous statutes should not be construed to abrogate treaties. That argument lacks merit. The canon applies only to ambiguous statutes (and as we have just explained, this statute is not ambiguous).

The Constitution establishes that statutes enacted by Congress with the concurrence of the President (or over his veto) have no less weight than treaties made by the President with the advice and consent of two-thirds of the Senate. *See* U.S. CONST. art. II, § 2, cl. 2; U.S. CONST. art. VI, cl. 2; *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314 (1829) (Marshall, C.J.). Consistent with this doctrine, the Supreme Court has long recognized that a later-enacted statute trumps an earlier-enacted treaty to the extent the two conflict. This is known as the last-in-time rule. *See Whitney v. Robertson*, 124 U.S. 190, 194 (1888) (if self-executing treaty and statute "are inconsistent, the one last in date will control the other"); *see also Breard v. Greene*, 523 U.S. 371, 376 (1998); *Kappus v. Comm'r*, 337 F.3d 1053, 1057 (D.C. Cir. 2003); *S. African Airways v. Dole*, 817 F.2d 119, 124-26 (D.C. Cir. 1987). At the same time, the Supreme Court also has stated that an ambiguous statute should be construed where fairly possible not to abrogate a treaty. *See Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243,

252 (1984); *see also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 237 (D.C. Cir. 2003); *S. African Airways*, 817 F.2d at 125. The combination of the last-in-time rule and the canon against abrogation has produced a straightforward practice: Courts apply a statute according to its terms even if the statute conflicts with a prior treaty (the last-in-time rule), but where fairly possible, courts tend to construe an *ambiguous* statute not to conflict with a prior treaty (the canon against abrogation).

The canon against construing ambiguous statutes to abrogate prior treaties does not help plaintiffs here, however, because the amended Migratory Bird Treaty Act is unambiguous, as we concluded above. To accept plaintiffs' argument with respect to the canon, we would have to *distort* the plain meaning of a statute in an attempt to make it consistent with a prior treaty. The Supreme Court has not extended the canon that far, and for good reason: Distorting statutory language simply to avoid conflicts with treaties would elevate treaties above statutes in contravention of the Constitution.

\* \* \*

The Migratory Bird Treaty Act implements the migratory bird conventions. The Migratory Bird Treaty Reform Act amends that earlier statute and makes clear that mute swans are not protected by the Act. The canon against interpreting a statute to abrogate a treaty does not apply because the amended statute is plain. We affirm the District Court's judgment.

*So ordered*.

KAVANAUGH, *Circuit Judge*, concurring: Plaintiffs argue that the amended Migratory Bird Treaty Act is ambiguous, and they rely on the canon against construing an ambiguous statute to abrogate a treaty. The Court concludes that the statute is plain and that the canon therefore does not apply. I add this concurrence because, even assuming the statute is ambiguous, the canon should not apply in cases involving non-self-executing treaties such as the migratory bird conventions.

1. The Supreme Court has stated that a self-executing treaty is one that "operates of itself without the aid of any legislative provision," whereas a non-self-executing treaty "addresses itself to the political, not the judicial department; and the legislature must execute the contract before it can become a rule for the Court." *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314 (1829) (Marshall, C.J.); *see also Chae Chan Ping v. United States*, 130 U.S. 581, 600 (1889); *Whitney v. Robertson*, 124 U.S. 190, 194 (1888); *Head Money Cases*, 112 U.S. 580, 598-99 (1884). Like statutes, self-executing treaties automatically become part of domestic American law. By contrast, non-self-executing treaties have no effect or force as a matter of domestic law (though Congress may choose to incorporate parts of non-self-executing treaties into domestic law by enacting implementing statutes). *See Whitney*, 124 U.S. at 194 ("When the stipulations [of a treaty] are not self-executing, they can only be enforced pursuant to legislation to carry them into effect, and such legislation is as much subject to modification and repeal by congress as legislation upon any other subject."); *see also* 1 RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 111 cmt. h (1987) ("[S]trictly, it is the implementing legislation, rather than the agreement itself, that is given effect as law in the United States. That is true even when a non-self-executing agreement is 'enacted' by, or incorporated in, implementing legislation.").

The canon against interpreting ambiguous statutes to abrogate treaties applies with respect to self-executing treaties,

which have the force of American law. *See Trans World
Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252 (1984);
*Cook v. United States*, 288 U.S. 102, 119-20 (1933). The canon
is quite similar to the familiar doctrine against implied repeal of
statutes – under which courts will not interpret an ambiguous
statute to repeal a prior statute. *See J.E.M. Ag Supply, Inc. v.
Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 141-42 (2001); *see
also S. African Airways v. Dole*, 817 F.2d 119, 126 (D.C. Cir.
1987) (noting that Supreme Court has "compared the abrogation
of a treaty through an act of Congress to the repeal of one statute
by another . . . [because] 'the rule is well settled that repeals by
implication are not favored . . . .'" (quoting *Chew Heong v.
United States*, 112 U.S. 536, 549 (1884))).

There is little authority squarely analyzing whether those
interpretive principles should extend to *non-self-executing*
treaties, which have no force as a matter of domestic law.
Courts have reason to be cautious about taking that step,
however. When the Legislative and Executive Branches have
chosen not to incorporate certain provisions of a non-self-
executing treaty into domestic law, we must assume that they
acted intentionally. Given such a deliberate decision by the
Legislative and Executive Branches, basic principles of judicial
restraint counsel courts to refrain from bringing the non-self-
executing treaty into domestic law through the back door (by
using the treaty to resolve questions of American law). In other
words, because non-self-executing treaties have no legal status
in American courts, there seems to be little justification for a
court to put a thumb on the scale in favor of a non-self-executing
treaty when interpreting a statute. Doing so would not reflect
the appropriate judicial deference to the Legislative and
Executive Branches in determining if, when, and how to
incorporate treaty obligations into domestic law.

Concluding that the canon does not apply with respect to

3

non-self-executing treaties "in no way disparages the importance" of treaty obligations. *Sanchez-Llamas v. Oregon*, 126 S. Ct. 2669, 2687 (2006). Rather, it respects the proper limits and role of the Judiciary in relation to the Legislative and Executive Branches. *See* 1 RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 111(3) (1987) ("Courts in the United States are bound to give effect to international law and to international agreements of the United States, except that a 'non-self-executing' agreement will not be given effect as law in the absence of necessary implementation.").

To be sure, the canon has been referenced in passing in some cases that may involve non-self-executing treaties. And some have expressly concluded that the canon should apply even with respect to non-self-executing treaties. *See Ma v. Ashcroft*, 257 F.3d 1095, 1114 (9th Cir. 2001); *see also* David Cole, *The Idea of Humanity: Human Rights and Immigrants' Rights*, 37 COLUM. HUM. RTS. L. REV. 627, 647 (2006). But that conclusion is questionable in light of the principles of judicial restraint outlined above (even if one were to accept a more limited proposition that non-self-executing treaties may warrant "respectful consideration" in interpreting certain statutes, *cf. Sanchez-Llamas*, 126 S. Ct. at 2685).

2. If the canon against abrogation does not apply with respect to non-self-executing treaties, plaintiffs' reliance on the canon in this case necessarily rests on an assumption that the migratory bird conventions are self-executing. The migratory bird conventions, however, are non-self-executing.

Courts generally hold a treaty is non-self-executing when one of the following conditions applies:

• the treaty itself contemplates implementing legislation,

*see Foster*, 27 U.S. at 314; *Diggs v. Richardson*, 555 F.2d 848, 851 (D.C. Cir. 1976); *see also Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 376 (7th Cir. 1985); *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1298-99 (3d Cir. 1979); *United States v. Postal*, 589 F.2d 862, 876-77 (5th Cir. 1979);

• the treaty provides no private right of action, *see Head Money Cases*, 112 U.S. at 598-99; *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 442-43 (1989); *Comm. of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 938 (D.C. Cir. 1988); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 808 (D.C. Cir. 1984) (Bork, J., concurring); *see also Goldstar (Panama) S.A. v. United States*, 967 F.2d 965, 968 (4th Cir. 1992);

• the Executive Branch or Senate indicates during the treaty-making or treaty-ratifying process, for example, that the treaty is non-self-executing, *see Sosa v. Alvarez-Machain*, 542 U.S. 692, 728, 735 (2004); *see also Renkel v. United States*, 456 F.3d 640, 644 (6th Cir. 2006); *Frolova*, 761 F.2d at 376;

• the treaty provisions are precatory, aspirational, or otherwise too vague to be judicially enforceable, *see INS v. Stevic*, 467 U.S. 407, 428 n.22 (1984); *Diggs*, 555 F.2d at 851; *see also Frolova*, 761 F.2d at 374; or

• the treaty imposes substantive obligations that would contravene a provision of the Constitution, *see Reid v. Covert*, 354 U.S. 1, 16 (1957) (plurality opinion).

In recent years, courts have hesitated to find a treaty self-executing – perhaps because the practical effect of finding a treaty self-executing is to eliminate the House of Representatives from the law-making process, even for laws

that may have significant domestic impact. *Cf.* U.S. CONST. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."); AKHIL REED AMAR, AMERICA'S CONSTITUTION: A BIOGRAPHY 304 (2005) ("The general intuition behind this doctrine [of non-self-execution] is that some things cannot be done domestically unless the people's House concurs."); Jack L. Goldsmith, *The New Formalism in United States Foreign Relations Law*, 70 U. COLO. L. REV. 1395, 1429 & n.126 (1999) ("In recent years courts" have adopted approach that "presumes that a treaty is non-self-executing."); *cf. also United States v. Emuegbunam*, 268 F.3d 377, 389 (6th Cir. 2001) ("[C]ourts presume that the rights created by an international treaty belong to a state and that a private individual cannot enforce them."); *Garza v. Lappin*, 253 F.3d 918, 924 (7th Cir. 2001) ("[A]s a general rule, international agreements, even those benefitting private parties, do not create private rights enforceable in domestic courts.").

Applying the settled precedents and principles for determining the status of treaties, the migratory bird conventions plainly are non-self-executing. First, the text of the migratory bird conventions contemplates implementing legislation. *See* Convention for the Protection of Migratory Birds, U.S.-Gr. Brit., art. VIII, Aug. 16, 1916, 39 Stat. 1702, 1704 (United States and Canada agreed "to take, or propose to their respective appropriate law-making bodies, the necessary measures for insuring the execution of the present Convention."); Convention for the Protection of Migratory Birds and Game Mammals, U.S.-Mex., art. II, Feb. 7, 1936, 50 Stat. 1311, 1312 (United States and Mexico agreed "to establish laws, regulations and provisions to satisfy the need" for migratory bird protection). Second, the Canada and Mexico conventions contain pledges to enact restrictions on hunting and killing migratory birds; they do not create any private right of

action.

\* \* \*

In sum, even if the amended Migratory Bird Treaty Act is ambiguous, the canon against interpreting an ambiguous statute to abrogate a treaty should not apply here because the migratory bird conventions are non-self-executing.