# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued May 6, 2013            Decided July 26, 2013

No. 12-1264

OWNER-OPERATOR INDEPENDENT DRIVERS ASS'N, INC.,
PETITIONER

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, ET AL.,
RESPONDENTS

———

On Petition for Review of an Order of
the Federal Motor Carrier Safety Administration

———

*Paul D. Cullen, Sr.* argued the cause for petitioner. With him on the briefs were *Joyce E. Mayers* and *Paul D. Cullen, Jr.*

*Dana Kaersvang*, Attorney, U.S. Department of Justice, argued the cause for respondents. With her on the brief were *Stuart F. Delery*, Principal Deputy Attorney General, *Ronald C. Machen, Jr.*, U.S. Attorney, *Michael S. Raab* and *Michael P. Abate*, Attorneys, *Paul M. Geier*, Assistant General Counsel for Litigation, Federal Motor Carrier Safety Administration, and *Peter J. Plocki*, Deputy Assistant General Counsel for Litigation.

2

*Stephan E. Becker* and *Daron T. Carreiro* were on the brief for *amicus curiae* The United Mexican States in support of respondents.

Before: GARLAND, *Chief Judge*, BROWN, *Circuit Judge*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the court filed by *Circuit Judge* BROWN.

Dissenting opinion filed by *Senior Circuit Judge* SENTELLE.

BROWN, *Circuit Judge*: The Owner-Operator Independent Drivers Association (OOIDA), a trade association, challenges the decision of the Federal Motor Carrier Safety Administration (FMCSA) to exempt commercial vehicle operators licensed in Canada or Mexico from certain statutory medical certification requirements applicable to drivers licensed in the United States. The FMCSA claims that applying these requirements to these foreign drivers would violate existing executive agreements between those two countries and the United States. OOIDA cares naught for these agreements, instead relying on generally applicable statutory text. The question we must answer is whether a facially unambiguous statute of general application is enough to abrogate an existing international agreement without some further indication Congress intended such a repudiation. We conclude it is not.

I

Under federal law, "[n]o individual shall operate a commercial motor vehicle without a valid commercial driver's license." 49 U.S.C. § 31302. Individual states issue

these licenses, but the federal government specifies "minimum uniform standards" via regulations contained in 49 C.F.R. Part 383. *Id.* § 31308; *see Int'l Bhd. of Teamsters v. Peña*, 17 F.3d 1478, 1481 (D.C. Cir. 1994). In addition to obtaining commercial driver's licenses, U.S. commercial vehicle operators must receive medical certification verifying that their "physical condition . . . is adequate to enable them to operate the vehicles safely." 49 U.S.C. § 31136(a)(3). For American drivers, this prerequisite to operating a commercial vehicle is separate from the process for obtaining a commercial driver's license. *See* 49 C.F.R. § 391.41.

To facilitate trade, the United States has entered into "executive agreements" with Mexico and Canada for reciprocal licensing of commercial drivers operating across national borders. Executive agreements are not quite treaties; while the latter require Senate ratification, the former carry the force of law as an exercise of the President's foreign policy powers. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414–15 (2003). In the case of Mexico, a memorandum of understanding ("MOU") enshrined some basic principles from which to structure regulation, including joint recognition of U.S. commercial driver's licenses and Mexico's "Licencia Federal de Conductor," acknowledgment by the United States of its need to imitate Mexico's system "for including driver medical qualification determinations" within the licensing process, and an understanding that drivers "shall be subject to the applicable laws and regulations of the country in which they operate such motor vehicles." The United States concluded a similar agreement with Canada in 1998, with the Federal Highway Administration (FHWA) affirming that "the medical provisions of the Canadian National Safety Code for Motor Carriers . . . are equivalent to the medical fitness

regulations in the [Federal Motor Carrier Safety Regulations]."

Unlike the American system, which separates medical certification from the commercial vehicle licensing process, Mexico and Canada incorporate physical fitness criteria as part of their licensing regimes. For this reason, the FHWA treats commercial licenses from these countries as themselves proof of medical fitness. *See Motor Carrier Safety Regulations: Technical Amendments*, 67 Fed. Reg. 61,818, 61,819 (Oct. 2, 2002); *Commercial Driver's License Reciprocity with Mexico*, 57 Fed. Reg. 31,454, 31,455 (July 16, 1992).

For some time, medical certificates could be issued by anyone "licensed, certified, and/or registered, in accordance with applicable State laws and regulations, to perform physical examinations," 49 C.F.R. § 390.5 (2011), so long as the examiner was familiar with the physical demands placed on commercial motor vehicle operators and was "proficient in the use of" the federal protocols necessary to conduct the examination. *Id.* § 391.43(c) (2011). That changed in 2005 with enactment of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (the "Act"), Pub. L. No. 109-59, 119 Stat. 1144. Specifically, § 4116 of the Act, which governs the "Medical program," requires the Secretary of Transportation to "establish and maintain a current national registry of medical examiners who are qualified to perform examinations and issue medical certificates" necessary for drivers of commercial motor vehicles. 49 U.S.C. § 31149(d)(1). The Act further directs the Secretary to require all commercial vehicle operators "to have a current valid medical certificate," *id.* § 31149(c)(1)(B), and "accept as valid only medical certificates issued by persons on

the national registry," *id.* § 31149(d)(3). Section 4116 makes no mention of the reciprocal agreements with Canada and Mexico. *See* 119 Stat. 1726–28, 49 U.S.C. § 31149.

Several years later, the FMCSA proposed a new rule to effectuate the Act's call for a national registry of medical examiners and to implement more stringent training and testing requirements. *See National Registry of Certified Medical Examiners*, 73 Fed. Reg. 73,129 (Dec. 1, 2008). Under the proposed rule, only those medical certificates issued by examiners listed on the registry would be accepted as valid with one key exception: Mexican and Canadian drivers operating in the United States would "continue to be governed by the provisions of existing reciprocity agreements with Canada and Mexico, because they are not in conflict with 49 U.S.C. 31136(a)(3) and 31149." *Id.* at 73,131 n.3. Meaning, only drivers domiciled in the United States would need to obtain medical certificates from examiners on the national registry. OOIDA objected during the comment period, arguing the Act permitted of no such "exemption." The FMSCA rejected OOIDA's complaint in its final rule. *See National Registry of Certified Medical Examiners*, 77 Fed. Reg. 24,104, 24,110–11 (Apr. 20, 2012) ("Final Rule").

Having filed a petition for review, OOIDA now asks this Court to set aside that portion of the Final Rule specifying that the national registry requirements do not apply to the medical certification of properly licensed Canadian and Mexican drivers.

II

The Constitution places treaties and federal statutes on equal legal footing—both are "the supreme Law of the Land."

U.S. CONST. art. VI, cl. 2. Courts therefore approach conflicts between treaties and statutes the way they would a conflict between two treaties or two statutes: the more recent legal pronouncement controls. *Whitney v. Robertson*, 124 U.S. 190, 194 (1888). This is known as the last-in-time rule. *Kappus v. Comm'r of Internal Revenue*, 337 F.3d 1053, 1057 (D.C. Cir. 2003). But though the last-in-time rule tells courts how to resolve clashes between statutes and treaties, courts prefer to avoid such conflicts altogether. Thus, we presume that newly enacted statutes do not automatically abrogate existing treaties. *See South Dakota v. Bourland*, 508 U.S. 679, 687 (1993). The same principles govern the Executive Branch agreements with Mexico and Canada, even though they were not formal treaties ratified by the Senate. *See, e.g.*, *Weinberger v. Rossi*, 456 U.S. 25, 31 (1982).

In this case, the Act speaks in general yet textually unambiguous terms. Operators of commercial motor vehicles must have "a current valid medical certificate," 49 U.S.C. § 31149(c)(1)(B), and only a medical examiner listed on the "national registry" may issue one, *id.* § 31149(d). No exception is made for those drivers living in Canada or Mexico who operate their vehicles within the United States. But does such language sufficiently express Congress's intent to abrogate the executive agreements with Canada and Mexico? On this question, the case law is murky. There have been cases in which *ambiguous* statutes were interpreted to preserve preexisting treaties or executive agreements, *see, e.g.*, *Weinberger*, 456 U.S. at 28–32, and there have been cases in which unambiguous statutes *expressly* overrode international agreements, *see, e.g.*, *Kappus*, 337 F.3d at 1057–58. But the parties cite no case of quite this kind: a textually clear statute with no express reference—or any other

indication of its intended application—to conflicting international agreements.

OOIDA and the government conceptualize the presumption against implicit abrogation of international agreements in different ways. OOIDA views it as no more than an interpretive aid akin to the rule of lenity: applicable only to choose among multiple possible readings of a textually ambiguous statute. *Cf. Skilling v. United States*, 130 S. Ct. 2896, 2932 (2010). The government, on the other hand, sees it as a clear statement rule demanding that a statute expressly abrogate an international agreement before the last-in-time rule applies. *Cf. Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) ("[T]he requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." (internal quotation marks omitted)). OOIDA's interpretation, the government warns, "call[s] into question the United States' ability to import and export hundreds of billions of dollars of goods across its borders." Resp'ts' Br. 29. Because judicial pronouncements have vacillated between these two positions, we sympathize with the parties' confusion but ultimately agree with the government: absent some clear and overt indication from Congress, we will not construe a statute to abrogate existing international agreements even when the statute's text is not itself ambiguous.

## A

Both our precedents and the Supreme Court's routinely characterize the presumption against implicit abrogation of international agreements as a clear statement rule. *See Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252 (1984) ("Legislative silence is not sufficient to abrogate a

treaty."); *Weinberger*, 456 U.S. at 32 ("We think that some affirmative expression of congressional intent to abrogate the United States' international obligations is required . . . ."); *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 690 (1979) ("Absent explicit statutory language, we have been extremely reluctant to find congressional abrogation of treaty rights."); *Cook v. United States*, 288 U.S. 102, 120 (1933) ("A treaty will not be deemed to have been abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed."); *Roeder v. Islamic Republic of Iran* ("*Roeder I*"), 333 F.3d 228, 238 (D.C. Cir. 2003) ("Executive agreements are essentially contracts between nations, and . . . are expected to be honored by the parties. Congress (or the President acting alone) may abrogate an executive agreement, but legislation must be clear to ensure that Congress—and the President—have considered the consequences."); *see also Roeder v. Islamic Republic of Iran* ("*Roeder II*"), 646 F.3d 56, 61 (D.C. Cir. 2011) (expressly describing the presumption as a "clear statement requirement"). In one case, the Supreme Court even held an *ambiguous* treaty provision survived a later-enacted statute of general scope. *See Menominee Tribe of Indians v. United States*, 391 U.S. 404, 406 n.2, 410–12 (1968).[1] And crucially, the Court never deemed this later

---

[1] In *Menominee Tribe*, the Court also found relevant language in a related statute enacted by the same legislators that did expressly preserve existing treaty rights. 391 U.S. at 410–411. Analogously, we note that § 7105 of the Act expressly subjected Mexican and Canadian commercial vehicle operators to the same regulatory requirements drivers based in the United States face—at least with respect to transporting hazardous material. *See* 49 U.S.C. § 5103a(h). Though not automatically conclusive, this provision suggests that when Congress wished Mexican and Canadian drivers

statute ambiguous; much like the Act, it spoke in clear, albeit general, terms. *See id.* at 408; *cf. Trans World Airlines*, 466 U.S. at 252–53 (holding that Congress's repudiation of the gold standard, which offered the unit of account for enforcing a treaty, did not preclude an agency from continuing to adopt regulations for the treaty's enforcement).

That said, there are some choice passages in the case law bolstering OOIDA's weaker version of the presumption. *See Whitney*, 124 U.S. at 194 ("[C]ourts will always endeavor to construe" treaties and statutes "so as to give effect to both, if that can be done without violating the language of either . . . ."); *Fund for Animals, Inc. v. Kempthorne*, 472 F.3d 872, 879 (D.C. Cir. 2006) ("Courts apply a statute according to its terms even if the statute conflicts with a prior treaty (the last-in-time rule), but where fairly possible, courts tend to construe an *ambiguous* statute not to conflict with a prior treaty (the canon against abrogation)."); *see also S. African Airways v. Dole*, 817 F.2d 119, 124–27 (D.C. Cir. 1987). Taken at their word, these cases suggest that inasmuch as the Act's text is clear, the implication for the executive agreements is not of judicial concern.

What might account for these disparate signals in the case law? We think much turns on how courts have used the term "ambiguous" over the years. Historically, a court might deem a *statute* ambiguous even if its *text* was not. *See, e.g.*, *Albernaz v. United States*, 450 U.S. 333, 343 (1981) ("[W]e are not confronted with any statutory ambiguity. To the contrary, we are presented with statutory provisions which are unambiguous on their face *and a legislative history which*

to submit to U.S. regulatory requirements, it made that intention clear.

*gives us no reason to pause over the manner in which these provisions should be interpreted.*" (emphasis added)). These days, textual clarity is usually dispositive. Dubbing some statute "ambiguous" means only that its *text* "is reasonably susceptible to more than one meaning." *McCreary v. Offner*, 172 F.3d 76, 82 (D.C. Cir. 1999). Problem is, when dealing with the presumption against implicit abrogation of international agreements, many of the older cases employed the more capacious concept. For instance, in *Trans World Airlines*, the Supreme Court invoked the presumption against implicit abrogation of international agreements in the face of "ambiguous congressional *action*" despite a textually straightforward statute. 466 U.S. at 252 (emphasis added).[2] *Compare Chew Heong v. United States*, 112 U.S. 536, 549 (1884) ("The utmost that could be said, in the case supposed, would be that there was an apparent conflict between the *mere words* of the statute and the treaty." (emphasis added)), *with id.* ("[T]he court ought, if possible, to adopt that construction which recognize[s] and save[s] rights secured by the treaty."). Ironically, the word "ambiguous"—being susceptible to multiple meanings—has itself proven to be ambiguous.

If we are to choose among conflicting dicta, we will opt for those statements endorsed by the Supreme Court, which better resemble the government's position. More than just our interpretation of the case law, however, supports our conclusion that the presumption against implicit abrogation is a clear statement rule. Repudiating an executive agreement

---

[2] The Court then proceeded to examine the legislative history for some indication of Congress's desire to abrogate existing agreements. In this case, for what it is worth, the Act's legislative history makes no mention of the executive agreements with Canada and Mexico, let alone an intention to abrogate them. *See, e.g.*, S. REP. NO. 109-120, at 22 (2005).

raises concerns similar to those that justify other clear statement rules. We have previously required clear statements, for example, for "statutes that significantly alter the balance between Congress and the President." *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991). OOIDA's reading of the Act impinges on the President's foreign policymaking domain, as well as the FMCSA's role in enforcing that prerogative. And, much like the presumption against extraterritorial effect, requiring a clear statement rule with respect to implicit abrogation of international agreements "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013) (internal quotation marks omitted); *cf. Diggs v. Shultz*, 470 F.2d 461, 466 (D.C. Cir. 1972) (refusing to employ the presumption against implicit abrogation of treaties because doing so would "raise questions of foreign policy and national defense as sensitive as those involved in the decision to honor or abrogate our treaty obligations"). The same wisdom counsels that we not presume the Act repudiates the executive agreements with Mexico and Canada *sub silentio*.

B

OOIDA's best case is *Fund for Animals*, which construed the Migratory Bird Treaty Reform Act (Reform Act) in light of existing treaties respecting the protection of migratory birds. *See* 472 F.3d at 874–77. That statute repudiated an earlier decision of this Court holding that, pursuant to U.S. treaty obligations, the Secretary of the Interior could not exclude the mute swan from protection. *See Hill v. Norton*, 275 F.3d 98 (D.C. Cir. 2001). Rejecting the complaint that the new statute should not be understood to violate the international agreements on migratory birds, *Fund for*

*Animals* asserted that "the canon of construction that ambiguous statutes should not be construed to abrogate treaties . . . . applies only to ambiguous statutes (and as we have just explained, this statute is not ambiguous)." 472 F.3d at 878. This language appears to erect precisely the threshold test OOIDA favors: Look to the statutory text. If it is unambiguous, ignore any international agreements that may exist; if it is ambiguous, only then interpret the statute as consistent with these agreements.

Several considerations dissuade us from elevating this dictum to a doctrine. First, this weaker version of the presumption against implicit abrogation conflicts with the clear statement rule prescribed by *Roeder I* and *II*—two cases that sandwiched *Fund for Animals* temporally—as well as past Supreme Court practice. Second, and more importantly, the statute in *Fund for Animals* is readily distinguishable. The Reform Act included a "sense of Congress" provision voicing disagreement with this Court's previous interpretation of the treaty at issue. *See id.* at 877. Though the provision asserted that the new statute offered the true interpretation of the treaty rather than a repudiation of it, it nonetheless showed Congress's express desire to abrogate the treaty's prior *application*. And finally, even without the "sense of Congress" provision, the Reform Act was obviously remedial—even its title is a dead giveaway. When it comes to the present case, however, nothing in the Act speaks so plainly to Congress's intent to alter the legal landscape. Though *Fund for Animals* may have suggested a more permissive standard, the Reform Act offered precisely the express indication of congressional intent a clear statement rule requires.

It stands to reason that if Congress or the President understood the Act to be a repudiation of the federal government's obligations to Mexico and Canada, someone would have said something. But contrary to what the dissent claims, our decision is directed by a legal presumption, not an "inquiry into congressional and presidential motives." Dissenting Op. 6. We remain, as ever, guided by the text. In circumstances like this one that demand a clear statement, part of the textual analysis involves drawing insight from what Congress chose *not* to say along with what it did. In reality, it is not our treatment of the presumption in this case that the dissent indicts, but all clear statement rules. After all, any clear statement rule involves an unwillingness to give full effect to a statute's unambiguous text. That is how they work. *See Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869, 2878 (2010) ("When a statute gives no clear indication of an extraterritorial application, it has none."); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 237 (1995) ("[S]tatutes do *not* apply retroactively unless Congress expressly states that they do."); *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985) (holding that a state constitutional provision providing that "[s]uits may be brought against the State . . . in such courts as shall be directed by law" was insufficient to constitute a waiver of Eleventh Amendment immunity because such a waiver "must specify the State's intention to subject itself to suit in *federal court*"); *id.* at 242–46 (holding that remedies under the Rehabilitation Act for violations by "any recipient of Federal assistance" did not extend to violations by a State recipient because Congress did not make "unmistakably clear in the language of the statute" its intention to abrogate State immunity).

Our invocation of the presumption against implicit abrogation of international agreements is born of common

sense. Our dissenting colleague laments how much "harder" today's opinion makes it for Congress to override existing agreements. Dissenting Op. 4. But inserting a phrase like "notwithstanding any existing international agreement" into a bill does not threaten to exhaust legislative resources. Like all clear statement rules, the one we acknowledge today injects clarity into the policymaking process. It permits Congress, the President, the courts, and the public alike to better comprehend the actual implications of legislation. We therefore presume the Act was not intended to abrogate the executive agreements with Mexico and Canada and hold that the FMCSA's implementing rules appropriately understood the medical certificate requirement to apply only to drivers based in the United States.

## III

Having dispensed with OOIDA's main contention, we turn now to its secondary argument. In a Wittgensteinian move, OOIDA attempts to dissolve the controversy altogether—at least with respect to Mexican drivers[3]—by contending there is no conflict between the MOU and general application of the Act's national registry requirement. OOIDA invokes the interplay of the MOU's Articles 3 and 4:

> *Article 3*

---

[3] It is not entirely clear from its reply brief whether OOIDA thinks its argument on this point can be generalized to the executive agreement with Canada. *See* Reply Br. 3 & n.1. Whatever OOIDA's intentions may be, it makes no difference. OOIDA devoted the entirety of its discussion to the language of the MOU, and we need not address conclusory arguments that receive no further development. *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001) (per curiam).

**Medical Qualification**
In recognition of the medical qualification program for a Licencia Federal de Conductor, the United States of America shall conduct a comprehensive study of processes for including driver medical qualification determinations within its commercial driver's licensing process.

*Article 4*

**Application of Law**
U.S. and Mexican drivers of motor vehicles . . . shall be subject to the applicable laws and regulations of the country in which they operate such motor vehicles.

OOIDA draws two inferences from this language: first, the MOU does not dictate "how either country must deal with medical qualifications or certification of those qualifications"; and second, "Article 4 of the MOU specifically provided that driver qualifications are to be determined by the laws of the country in which they operate." Pet'r's Br. 16. OOIDA thus concludes that requiring Mexican drivers to obtain medical certificates from examiners on the national registry is consistent with the MOU.

OOIDA's theory flatly ignores Article 2 of the MOU, which specifies that each country "shall require drivers, licensed pursuant to its authority, to . . . meet its established medical standards." Article 2 also provides that "all Commercial Driver's Licenses and Licencias Federales de Conductor issued pursuant to" this requirement "shall be

given complete recognition and validity by Federal and State authorities in both countries." Thus, the MOU explicitly requires (1) that Mexican drivers licensed in Mexico must meet Mexico's medical standards, and (2) that the United States must recognize Mexican licenses, which themselves certify that their holders have satisfied those medical standards.

In response to this fairly conclusive language, OOIDA advances a tortured distinction between meeting "established medical standards" and possessing certification of that fact. In other words, Article 2 may require that Mexican drivers satisfy Mexican medical standards, but a medical examiner on the U.S. national registry must separately certify that fact—or so OOIDA believes. Its reading is implausible. The United States cannot accord Mexico's Licencia Federal de Conductor "complete recognition and validity" if it refuses to acknowledge the medical fitness certification role the license plays. And certification is itself a part of satisfying "established medical standards."

Even were the MOU's text insufficiently clear, we draw insight from the 1992 FHWA rule, which, in implementing the MOU, treated the Licencia Federal de Conductor as certification of medical fitness. *See Commercial Driver's License Reciprocity with Mexico*, 57 Fed. Reg. at 31,455. OOIDA acknowledges FHWA's longstanding interpretation but believes it irrelevant to understanding the terms of the MOU. Not so. "Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184–85 (1982); *see Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961). Mexico's government sees things similarly,

*see* Br. for Amicus Curiae the United Mexican States 6–7, and the postratification understandings of signatory nations to a treaty are an additional interpretive aid, *see Medellín*, 552 U.S. at 507. These principles of treaty interpretation apply all the more strongly to executive agreements, where no potentially competing Senate view must be considered. We reject OOIDA's efforts to find consistency between the MOU and application of the Act to Mexican drivers.

## IV

For the foregoing reasons, the petition for review is

*Denied.*

SENTELLE, *Senior Circuit Judge*, dissenting: The majority concedes that the statute at issue is capable of only one interpretation, yet it reaches a result that it concedes is inconsistent with that interpretation. Because we lack authority to rewrite Congress's statutes, I respectfully dissent.

The Supremacy Clause of the Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. The rule of priority contained in the Supremacy Clause is straightforward: The Constitution trumps those statutes and treaties which are inconsistent with it. *See, e.g.*, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 180 (1803); *Reid v. Covert*, 354 U.S. 1, 16–17 (1957). If statutes or treaties are inconsistent with other statutes or treaties, the last-in-time rule applies, and the most recent statute or treaty controls. *See, e.g.*, *Breard v. Greene*, 523 U.S. 371, 376 (1998) (per curiam); *Covert*, 354 U.S. at 18; *Whitney v. Robertson*, 124 U.S. 190, 194 (1888). Where a statute potentially conflicts with a prior treaty, "an ambiguous statute should be construed where fairly possible not to abrogate a treaty." *Fund for Animals, Inc. v. Kempthorne*, 472 F.3d 872, 878 (D.C. Cir. 2006) (citing *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252 (1984)).

With these fundamental precepts in mind, this case ought to be simple. In the 1990s, the executive branch made agreements with Mexico and Canada that exempted Mexican and Canadian commercial drivers from a Department of Transportation ("DOT") regulation that all commercial drivers operating commercial vehicles in the United States must have a current medical certification. In 2005, Congress passed and the President signed a law requiring all

commercial motor vehicle operators in the United States "to have a current valid medical certificate" "issued by persons on" a newly-created "national registry of medical examiners." 49 U.S.C. § 31149(c)(1)(B), (d)(3).

Under the statute, then, all commercial drivers, including Mexican and Canadian drivers, need a medical certificate issued by an examiner on the national registry to operate commercial motor vehicles in the United States. But the DOT's promulgated rule, relying on the prior agreements, exempts Mexican and Canadian drivers from this statutory requirement.

Because the statute is last-in-time and clearly inconsistent with the earlier international agreements, the statute governs. The DOT rule at issue here would permit Mexican and Canadian drivers to operate commercial vehicles in the United States without following the statutory requirements of § 31149. It is therefore our obligation to grant the petition for review and vacate this unlawful rule.

The majority concedes that the statute is unambiguously inconsistent with the prior international agreements. The majority expresses worry about congressional intent, but given that Congress has passed statutory text that the majority concedes is inconsistent with the prior agreements, Congress's intent is no great mystery. Its statute contradicts the prior rule. That should be the end of the matter, for "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). But the majority goes on to justify elevating the prior agreements above the statutory text by manufacturing a heightened clear statement requirement not found in the Constitution, the Supreme Court's precedents, or this court's precedents.

First, the Constitution: "Distorting statutory language simply to avoid conflicts with treaties would elevate treaties above statutes in contravention of the Constitution." *Fund for Animals*, 472 F.3d at 879. Yet the court's decision today goes beyond distorting statutory language and abrogates it altogether. The court concedes that there is no other plausible interpretation of the statute, but then it goes on to hold that Congress must use some additional magic words to give the admittedly clear statute effect.

It has long been understood that the Supremacy Clause places treaties and statutes on equal footing, which is why courts have always evaluated conflicts between treaties and statutes using the last-in-time rule. The court's holding today elevates treaties above statutes by making it more difficult for Congress to abrogate prior treaties than prior statutes. The political branches can overrule a prior statute by enacting a new statute inconsistent with the old one. *See, e.g.*, *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662–63 (2007); *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936). Both the Supreme Court and this court have explained that this rule should apply identically to conflicts between a statute and a treaty. *See Chew Heong v. United States*, 112 U.S. 536, 549–50 (1884); *S. African Airways v. Dole*, 817 F.2d 119, 126 (D.C. Cir. 1987). Thus, the Supreme Court has explained: "The Constitution gives [a treaty] no superiority over an act of Congress in this respect, which may be repealed or modified by an act of a later date." *The Head Money Cases*, 112 U.S. 580, 599 (1884). The court today requires the political branches to do more to overrule prior treaties and international agreements than they would need to do to overrule prior statutes. There is no warrant in the Supremacy Clause for this result.

4

This result is especially troubling because the Supremacy Clause does not expressly encompass international agreements of the type at issue here. It is undisputed that the agreements before us were not entered pursuant to the Constitution's Treaty Clause. *See* U.S. Const. art. II, § 2, cl. 2 (giving the President "Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur"). Nor are they "Laws of the United States" enacted through bicameralism and presentment. *See id.* art. I, § 7, cl. 2. *See generally* Bradford R. Clark, *Separation of Powers as a Safeguard of Federalism*, 79 Tex. L. Rev. 1321, 1334–36 (2001). The Mexican agreement was made between the U.S. Secretary of Transportation and the Mexican Secretary of Communications and Transportation, while the Canadian "agreement" was contained in letters exchanged between two transportation bureaucrats in the United States and Canada. If "[d]istorting statutory language simply to avoid conflicts with treaties would elevate treaties above statutes in contravention of the Constitution," *Fund for Animals*, 472 F.3d at 879, distorting statutory language to avoid conflicts with international agreements even more obviously contravenes the Constitution.

It is now harder for Congress to overrule two letters exchanged between mid-level administrative functionaries than it would be for Congress to overrule a statute passed by a majority of the people's representatives and signed by the President. Nothing in the Constitution justifies transferring the people's right to govern themselves to Transport Canada's Director General of Road Safety and Motor Vehicle Regulation and an Associate Administrator in the U.S. Department of Transportation's Federal Highway Administration Office of Motor Carriers. Ours is a government of laws, not of bureaucrats.

Second, the Supreme Court's precedents: The majority does not dispute that no Supreme Court decisions require a clear statement rule. In all the Supreme Court cases relied upon by the majority in which the Court found no abrogation, the Court held that the relevant statutory text was ambiguous. For instance, in *Trans World Airlines*, there was no direct conflict between the treaty and the statute, so the Court refused to find abrogation given that the statute did not speak to the question at issue. 466 U.S. at 252. *Cook v. United States* emphasized that prior practice under the treaty could resolve only "*doubt* as to the construction of the" statute. 288 U.S. 102, 120 (1933) (emphasis added). *Weinberger v. Rossi* found no abrogation because the crucial word at issue was ambiguous. 456 U.S. 25, 29–36 (1982).

By contrast, the statute in this case is "textually unambiguous," as the majority concedes. Maj. Op. at 6. The Supreme Court has spelled out our role in such circumstances: "When the words of a statute are unambiguous, . . . th[e] first canon[, that a legislature says in a statute what it means and means in a statute what it says there] is also the last: judicial inquiry is complete." *Germain*, 503 U.S. at 253–54 (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)) (internal quotation marks omitted). The Supreme Court long ago made clear that "when a law is clear in its provisions, its validity cannot be assailed before the courts for want of conformity to stipulations of a previous treaty not already executed." *Whitney*, 124 U.S. at 195. A treaty "'made by the United States with any foreign nation . . . is subject to such acts as Congress may pass for its enforcement, modification, or repeal.'" *Id.* (quoting *Head Money Cases*, 112 U.S. at 599). Because we are governed by Supreme Court precedents, and the text of the statute is clear, I would go no further.

Third, this court's precedents: The court's new clear statement rule contradicts our own precedents. Never have we refused to find abrogation of a prior agreement where a later statute was clearly inconsistent with the agreement. In fact, as discussed, we have explicitly held that we do not "distort the plain meaning of a statute in an attempt to make it consistent with a prior treaty." *Fund for Animals*, 472 F.3d at 879 (emphasis omitted).

Before today, our circuit's law was that where we have an "unambiguous statutory mandate," the prior international agreement must give way. *Dole*, 817 F.2d at 125 n.2; *see Fund for Animals*, 472 F.3d at 879. Quoting the Supreme Court, we have called it "wholly immaterial to inquire" whether Congress departed from the prior agreement "by accident or design." *Dole*, 817 F.2d at 126 (quoting *Whitney*, 124 U.S. at 195) (emphasis omitted). Yet the majority uses the international agreements as the governing rule even while acknowledging that the later statute is unambiguous simply because it is unsure whether Congress and the President *really* meant to abrogate the agreement. *See* Maj. Op. at 12. In doing so, the majority departs from our precedents and fashions an inquiry into congressional and presidential motives.

As we recently recalled, a statutory canon of interpretation serves merely as "an interpretive aid, not an invitation to rewrite statutes." *Ass'n of Am. R.Rs. v. Dep't of Transp.*, No. 12-5204, slip op. at 14 n.7 (D.C. Cir. July 2, 2013). Accordingly, we have applied the canon against abrogation of a prior agreement only where the later statute was ambiguous in relevant respects, and we have always emphasized the statute's ambiguity. *See, e.g.*, *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 238 (D.C. Cir. 2003) (emphasizing that "the legislation itself is silent" on the

precise point of conflict between the statute and the prior agreement); *Roeder v. Islamic Republic of Iran*, 646 F.3d 56, 61 (D.C. Cir. 2011) ("An *ambiguous* statute cannot supercede an international agreement if an alternative reading is fairly possible." (emphasis added)).  The majority concedes that the statute here is unambiguous.  Therefore, the cases on which it relies are all distinguishable.  "The language of the statute is entirely clear, and if that is not what Congress meant then Congress has made a mistake and Congress will have to correct it."  *Conroy v. Aniskoff*, 507 U.S. 511, 528 (1993) (Scalia, J., concurring in the judgment).

Of course, it appears that nothing in the statute would prohibit the DOT from adding Mexican or Canadian doctors to the new national registry.  Further, the United States could choose to enter into new agreements with Mexico or Canada that would address these issues.

The court's opinion today departs from the precedents of the Supreme Court and this circuit, and is not founded in the Constitution.  I respectfully dissent.